BOBBY L. CATO AND PAMELA R. CATO, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9438-90.          Filed December 22, 1992.

*Evan L. Smith,* for petitioners.
*Carl D. Inskeep* and *Robert F. Conte,* for respondent.

OPINION

COHEN, *Judge:* Respondent determined the following deficiencies in, and additions to, petitioners' Federal income taxes:

*Additions to tax*

| Year | Deficiency | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) | Sec. 6651 | Sec. 6661 |
|------|-----------|-----------------|-----------------|--------------------|--------------------|-----------|-----------|
| 1985 | $34,252 | $1,713 | [1] | - - - | - - - | - - - | $8,563 |
| 1986 | 20,852 | - - - | - - - | $1,043 | [2] | - - - | 5,213 |
| 1987 | 16,019 | - - - | - - - | 801 | [3] | $801 | 4,005 |
| 1988 | 16,229 | 811 | - - - | - - - | - - - | - - - | 4,057 |

[1] 50 percent of the interest due on $34,252.
[2] 50 percent of the interest due on $20,852.
[3] 50 percent of the interest due on $16,019.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The deficiencies in tax for 1985, 1986, 1987, and 1988 are based upon respondent's determination that petitioners could not exclude Supplemental Security Income (SSI) payments from gross income under section 131 and that they did not report rental income. The deficiency for 1985 is also based on respondent's disallowance of Schedule C expenses. The additions to tax under sections 6653(a) and 6661 were conceded by respondent for 1986, 1987, and 1988, leaving those additions to tax in dispute only for 1985. With respect to the remaining additions to tax, petitioners presented neither evidence nor argument. Certain adjustments in the statutory notice were not contested by petitioners or were subsequently abandoned by them.

After concessions by the parties and abandonment of certain issues by petitioners, the issues for decision are:

(1) Whether SSI payments received by Bobby L. Cato (petitioner) in 1986, 1987, and 1988 for caring for developmentally disabled children in his small family home care facility are excludable from income under section 131; and

(2) whether foster care receipts from the operation of petitioner's small family home care facility are subject to self-employment tax for the years at issue.

These issues have not heretofore been decided.

## Background

This case was submitted fully stipulated pursuant to Rule 122; the stipulated facts are incorporated as our findings by this reference. Some of the facts set forth herein are based upon examination of the exhibits and were not set out in the stipulation.

Petitioners were residents of the State of California when they filed their petition. Petitioner ran a foster care facility licensed by the California Department of Social Services (CDSS) as a Small Family Home (SFH) during the years in issue. Petitioner's SFH housed developmentally disabled children.

A developmentally disabled child is defined as one suffering from substantial and continuing handicaps, such as mental retardation, cerebral palsy, epilepsy, and autism. The State of California uses private nonprofit community agencies to coordinate the administration of foster care services to developmentally disabled individuals. These private nonprofit agencies are referred to as regional centers. Regional centers are State-licensed nonprofit corporations that qualify under section 501(c)(3) as exempt from tax under section 501(a). The regional centers are under the supervision of the CDSS.

Among the services provided by regional centers are placement of developmentally disabled children into foster care facilities and coordination of foster care reimbursements to these care facilities. Regional centers use only licensed care facilities for placement of the developmentally disabled children. Licensing is administered by the CDSS. One category of licensed care facilities used by regional centers is the SFH. SFH's are defined as those in which the owner/operator resides in the care facility. The relationship between the owner/operator of the SFH and the regional center is based on

a contract that provides for a specified level of care for the foster children placed at the SFH.

The regional center pays the owner/operator of each SFH a legislatively mandated reimbursement amount for the care of foster children placed at the SFH; the amount is not negotiable between the SFH and the regional center. The reimbursement is determined by the California legislature, with the recommendation of the State Department of Developmental Services. The reimbursement amount is calculated by estimating the cost of care for each child, considering the intensity of staffing needed for a facility to provide for the needs of a developmentally disabled child. Developmentally disabled children are matched with an SFH that provides the specific level of care needed. A specific SFH receives the same reimbursement amount for each child placed with it, and that amount is paid monthly.

The regional centers receive their operating budgets from the State of California; budgeted amounts are paid from the State's general treasury revenues. The operating budget is determined by the number of individuals to be placed by the regional centers, the type of care required, and the estimated cost for such care.

The regional centers also receive funds from outside sources. If such funds are received on behalf of a particular child, they are segregated and deposited in a separate trust account for the benefit of that child. The Social Security Administration (SSA) is one such outside source. The SSA pays SSI to regional centers on behalf of certain children; the children must be developmentally disabled to receive SSI funds. The regional centers are designated as the third-party payee of the child's SSI entitlement in those cases.

If the regional center becomes a third-party payee for SSI funds on behalf of a developmentally disabled child, these funds are deposited on a monthly basis directly into the child's separate trust account by the SSA. The regional centers then make payments, by check, equal to the entire trust balance, from the child's trust account to the care facility housing the child. The regional centers reduce the amount of their standard monthly reimbursement check to that same care facility by the amount of the trust fund payments. Thus, each SFH will receive two checks from the regional centers, one representing funds from their foster child's trust account

balance and one representing California's contract monthly reimbursement amount less the amount paid from the child's trust account for that month.

If the regional center is not designated as a third-party payee on the SSI entitlement, the regional center is still responsible only for the amount by which the mandated monthly reimbursement amount exceeds the child's SSI entitlement.

At the end of each calendar year, the regional centers issue Forms 1099 to the care facilities. The total Federal and State moneys that the regional centers transfer during the year are included in the Forms 1099.

The children in petitioner's SFH were placed there by two different regional centers in California, the South Central Los Angeles Regional Center and the Harbor Regional Center (the regional centers). The SFH was located at 628 East 135th Street, Los Angeles, California.

In 1985, petitioners purchased a home at 1024 Helmick Street, Carson, California, but petitioner continued to reside at the SFH in Los Angeles for all applicable years. Petitioner's wife and children resided at the Helmick Street address after 1985. On bank loan applications signed by petitioners for the home, they indicated that the foster home was their only employment. On their 1985 tax return, petitioners listed the SFH as a Schedule C business. Petitioners also purchased a condominium in Palm Springs, California, in 1985.

Petitioners concede that, for 1985, they received $57,384 from the regional centers and incurred $30,493 in expenses associated with the SFH activity, resulting in net income of $26,891 from the SFH activity for 1985. Also, for 1985, respondent has conceded that petitioners are entitled to an additional Schedule A deduction of $2,861 for the Palm Springs condominium, representing unclaimed interest and real property tax deductions on the same property.

Petitioners reported all foster care moneys as gross receipts from a business on Schedule C of their 1985 return; they then subtracted $21,176 in SSI contributions as a "return or allowance" on Schedule C for that year.

For 1986, 1987, and 1988, petitioner received the following amounts from the two regional centers; the amounts include

the SSI payments received by the centers and forwarded to petitioner:

| Year | Harbor | South Central | Total | SSI portion |
|------|--------|---------------|-------|-------------|
| 1986 | $33,900 | $28,000 | $61,900 | $27,855 |
| 1987 | 33,948 | 25,942 | 59,890 | 26,967 |
| 1988 | 35,240 | 18,896 | 54,136 | 23,912 |

The parties have stipulated to the following Schedule E net rental income and loss amounts for the Palm Springs property:

| Year | Income/ (loss) |
|------|----------------|
| 1986 | $2,159 |
| 1987 | (2,183) |
| 1988 | 852 |

For all of the years in issue, petitioner operated a "foster family home" and the children placed in petitioner's SFH are "qualified foster individuals", as defined in section 131(b) and (c). Petitioner employed certain individuals to help at the SFH and, for 1985 through 1988, petitioners filed Forms 942, Employer's Quarterly Tax Return for Household Employees, for those workers.

A 1987 joint income tax return was signed by petitioners and by a paid preparer on August 15, 1988. It was postmarked August 20, 1988, and received by the Fresno Internal Revenue Service Center on August 22, 1988.

By stipulation of the parties, the foster care payments made by the regional centers to petitioner in 1986, 1987, and 1988, from the State of California's general treasury, are excluded from petitioners' income under section 131.

## Discussion

### Section 131

For taxable years beginning before January 1, 1986, section 131 provided that foster parents were allowed to exclude from gross income, under specified conditions, funds paid to them as reimbursements for the expenses of caring for foster children or as compensation for the additional care of foster children with physical, mental, or emotional handicaps. In

order to qualify for the exclusion, which was limited to expense reimbursements or difficulty of care payments, the foster care providers had to maintain detailed records of foster care income and expenses. For years after 1985, the Tax Reform Act of 1986 (TRA 1986), Pub. L. 99-514, section 1707, 100 Stat. 2085, 2781, amended section 131 to define the excludable amount as follows:

SEC. 131. CERTAIN FOSTER CARE PAYMENTS.

(a) GENERAL RULE.—Gross income shall not include amounts received by a foster care provider during the taxable year as qualified foster care payments.

(b) QUALIFIED FOSTER CARE PAYMENT DEFINED.—For purposes of this section—

(1) IN GENERAL.—The term "qualified foster care payment" means any amount—

(A) which is paid by a State or political subdivision thereof or by a placement agency which is described in section 501(c)(3) and exempt from tax under section 501(a), and

(B) which is—

(i) paid to the foster care provider for caring for a qualified foster individual in the foster care provider's home, or

(ii) a difficulty of care payment.

(2) QUALIFIED FOSTER INDIVIDUAL.—The term "qualified foster individual" means any individual who is living in a foster family home in which such individual was placed by—

(A) an agency of a State or a political subdivision thereof, or

(B) in the case of an individual who has not attained age 19, an organization which is licensed by a State (or political subdivision thereof) as a placement agency and which is described in section 501(c)(3) and exempt from tax under section 501(a).

\* \* \* \* \* \* \*

(c) DIFFICULTY OF CARE PAYMENTS.—For purposes of this section—

(1) DIFFICULTY OF CARE PAYMENTS.—The term "difficulty of care payments" means payments to individuals which are not described in subsection (b)(1)(B)(i), and which—

(A) are compensation for providing the additional care of a qualified foster individual which is—

(i) required by reason of a physical, mental, or emotional handicap of such individual with respect to which the State has determined that there is a need for additional compensation, and

(ii) provided in the home of the foster care provider, and

(B) are designated by the payor as compensation described in subparagraph (A).

(2) LIMITATION BASED ON NUMBER OF INDIVIDUALS.—In the case of any foster home, difficulty of care payments for any period to which such

payments relate shall not be excludable from gross income under subsection (a) to the extent such payments are made for more than—

    (A) 10 qualified foster individuals who have not attained age 19,
* * *

## A. *The "Plain" Language of Section 131*

The parties disagree about what amounts are "paid by a State or political subdivision thereof or by a placement agency" within the meaning of section 131(b)(1)(A). Each of the parties argues that the plain language of section 131 supports that party's interpretation. Petitioners contend that the plain language and legislative history of section 131 support their argument that "paid" means the physical transfer of foster care payments to the foster care provider by a State or political subdivision thereof or by a qualifying placement agency, regardless of the original source of the moneys.

Respondent concedes that the SSI payments can be offset by the proportional amount of documented expenses for the years in issue and that the payments made by the regional centers to petitioner that were funded by the State of California treasury are excludable under section 131. Respondent contends, however, that the SSI funds here are not excludable from income under section 131 because the regional centers were mere conduits for passing the federally sourced SSI funds to petitioner. Respondent asserts that payments to a foster care provider cannot be transformed into tax-exempt income simply by passing the funds through a State-licensed placement agency.

SSI is paid to disabled individuals as a Social Security benefit. As such, SSI may qualify for exclusion from the beneficiary's gross income. The SSI payments here were made to two of California's private nonprofit regional centers and then later paid by the regional centers to petitioner. These SSI payments originated from Federal sources, not from State or private nonprofit sources, but were transferred to petitioner through a placement agency referred to in section 131.

We believe that the so-called "plain meaning" of section 131 is sufficiently ambiguous to justify reference to legislative history in resolving the ambiguity.

## B. *Legislative History of Section 131*

If the statutory language gives rise to more than one reasonable interpretation, as here, our duty is "to find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested." *Commissioner v. Engle,* 464 U.S. 206, 217 (1984) (quoting *NLRB v. Lion Oil Co.,* 352 U.S. 282, 297 (1957)). "[E]xemptions and exclusions from taxable income should be construed narrowly, and the taxpayers must bring themselves within the clear scope of the exclusions." *Graves v. Commissioner,* 89 T.C. 49, 51 (1987). The Supreme Court has stated:

> In the interpretation of statutes, the function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress. * * *
>
> There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one "plainly at variance with the policy of the legislation as a whole" this Court has followed that purpose, rather than the literal words. * * * [*United States v. American Trucking Associations,* 310 U.S. 534, 542-543 (1940) (quoting *Ozawa v. United States,* 260 U.S. 178, 194 (1922)); fn. refs. omitted.]

As discussed by petitioners, the legislative history of section 131 indicates that section 131 was designed to encourage families to accept foster children into their homes. Section 131, as originally enacted in the Periodic Payment Settlement Act of 1982, Pub. L. 97-473, 96 Stat. 2606, achieved two goals: (1) It codified Rev. Rul. 77-280, 1977-2 C.B. 14, which allowed foster parents to offset foster income by foster care expenses, and (2) it excluded from income payments received for the care of handicapped children. S. Rept. 97-646 (1982), 1983-1 C.B. 514, 516-517.

An effect of section 131 was to exclude from gross income the compensation paid to foster parents for the care of handicapped children, regardless of actual expenses. These

excluded payments were labeled "difficulty of care" payments:

Difficulty of care payments are payments that are compensation for providing the additional care of a foster child which is required by reason of a physical, mental, or emotional handicap with respect to which the State had determined that there is a need for additional compensation and which is provided in the home of the foster parent.

In order for payments to be excludible, the foster child with respect to whom payments are made must be placed by an agency of a State or political subdivision thereof, or by a State-licensed, private, tax-exempt agency. [H. Conf. Rept. 97-984 (1982), 1983-1 C.B. 522.]

Prior to the amendment of section 131 by TRA 1986, foster parents were required to account for the expenses incurred for ordinary foster care of children in their homes, because sums received for providing such care were excludable from the parents' income only as reimbursement for these expenses, but extra compensation for the care of disabled children was excluded from income irrespective of the expense involved. TRA 1986 expanded section 131 to exclude all foster care receipts from income in the same manner that "difficulty of care payments" were excluded in the original enactment. Petitioners have urged us to examine the legislative history of section 131 to support their position in this case. They have relied extensively on the legislative history leading to the 1986 amendment of section 131. Petitioners argue that the 1986 amendment was added for the following reasons:

Reasons for Change

The committee [House Ways and Means] believes that the current level of foster care payments closely approximates (or perhaps understates) the costs incurred in the care of foster children. The committee consequently believes that it is unnecessary to require foster parents to maintain detailed records of every expenditure in connection with each foster child as a condition for the exclusion to apply to foster care payments from State agencies or certain State-licensed child-placement agencies. The record keeping necessitated by present law requires prorating such expenses as housing and utility costs as well as expenditures for food. The committee believes that the requirement of such detailed and complex record keeping may deter families from accepting foster children or from claiming the full exclusion from income to which they are entitled. [H. Rept. 99-426 (1985), 1986-3 C.B. (Vol. 2) 1, 863.]

There are no Senate amendments or reports relating to the 1986 amendment. The conference agreement report on the amended section "follows the House bill in eliminating the requirement of detailed record keeping as a condition for obtaining the exclusion. This provision otherwise does not expand the types of payments eligible for the exclusion." H. Conf. Rept. 99-841 (1986), 1986-3 C.B. (Vol. 4) 1, 838.

C. *Application of Section 131 to Petitioners*

In this case, the parties have stipulated that petitioner's SFH is a "foster family home" and the children placed by the regional centers in petitioner's SFH are "qualified foster individuals", all within the meaning of section 131. Thus, we are concerned only with whether the SSI payments are "qualified foster care payments" by reason of being "paid by a State or political subdivision thereof or by a placement agency" such as the regional centers here.

The import of Congress was that qualified foster parents were to receive an exemption from record-keeping obligations as long as the moneys paid to the foster parents were controlled by the State or by a nonprofit foster child placement agency. There is no indication in any of the House or Senate hearings on the bill or in the reports of either congressional branch that would indicate that a distinction should be made that section 131 only applies if a tax-exempt agency is State funded. The legislative history of section 131 gives us no indication that the source of those nonprofit agencies' funding was to be taken into consideration.

The State of California determines by legislative mandate the amount that will be paid as reimbursement for the expenses of housing a foster child. The payments are referred to as "reimbursements" and not as compensation. The regional centers are limited by the legislative mandate on the amounts that can be paid to a particular foster parent, whether the funds are from State general treasury revenue or Federal SSI. Here, the payments to petitioner were controlled by tax-exempt State-licensed regional centers as required under section 131.

Overall, there is no rationale in the legislative history or actual language of section 131 for respondent's position of excluding State foster care moneys received by the regional

centers, but not Federal moneys received for the same purpose. There is no logical explanation given by respondent for looking to the source of a foster care allotment in defining who "paid" the allotment. We are persuaded that the general purpose of section 131(b)(1)(A) was to ensure that the State or a tax-exempt agency was administering the funds paid for foster care. In other words, direct payments by private persons or entities would not qualify for exclusion.

Additionally, the Adoption Assistance and Child Welfare Act of 1980, Pub. L. 96-272, 94 Stat. 500-510, 42 U.S.C. secs. 670-679a (1988), provides Federal financial assistance to States for providing foster care and adoption assistance to children. With this Federal financial participation, State programs make "foster care maintenance payments" to children who meet the statutory requirements. *Id.,* 94 Stat. 514, 42 U.S.C. secs. 670-671 (1988). The Adoption Assistance and Child Welfare Act of 1980 defines such payments as "payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation." *Id.,* 94 Stat. 510, 42 U.S.C. sec. 675(4) (1988). Thus, even the State-sponsored foster care payments, which respondent stipulated to be excluded from income under section 131, may be derived from Federal funds.

Respondent relies on a conduit theory reflected in *Seven-Up Co. v. Commissioner,* 14 T.C. 965 (1950), and *Electric Energy, Inc. v. United States,* 13 Cl. Ct. 644 (1987). In both cases, the courts applied the trust fund doctrine and held that, where a party was acting as a mere custodian of funds held in trust and was obliged to spend those funds for the benefit of a third party with no benefit to itself, the custodian was a mere conduit for the passing of the funds and should not be taxed on such funds. *Seven-Up Co. v. Commissioner, supra; Electric Energy, Inc. v. United States, supra.* Here, the regional centers held SSI funds and passed them on to petitioner. However, the regional centers did benefit from holding the funds; they no longer had the obligation to pay out of their general budget the foster care covered by SSI funds.

The two cases relied on by respondent involve situations where the conduit entities received funds that were expressly required by written contracts to be paid for the benefit of

others. The question was whether the conduit (i.e., the regional centers) was to be taxed. The cases did not address whether the ultimate recipients of the funds were subject to tax on the amounts they received from the conduit. Here, the recipients qualified for exclusion from gross income under section 131.

Furthermore, as discussed above, the State of California receives Federal funds to make foster care payments. 94 Stat. 500-510, 42 U.S.C. secs. 670-679(a) (1988). Respondent's argument might require that even State funds, to the extent that those funds derive from Federal moneys, be taken out of the section 131 exclusion. Eliminating the federally funded portions of State foster care budgets makes the amendment of section 131 meaningless because no parent would be exempt from the record-keeping requirements that would be required to prove that the Federal portion of State funding was a reimbursement and not income. Thus, we reject respondent's conduit theory.

Respondent likewise relies on *Bannon v. Commissioner,* 99 T.C. 59 (1992), for the proposition that the SSI funds are taxable because the foster children, not the regional centers or petitioner, were the ultimate beneficiaries of the SSI funds. Respondent also argues that, in effect, the children received SSI tax free and then paid petitioner, via the regional centers, for foster services provided, which make such funds taxable.

In *Bannon,* a mother received California State assistance on behalf of her disabled adult daughter to provide nonmedical care. The State determined the number of care hours required by the daughter, and the mother was required to submit detailed time records certifying the number of hours of supportive services she and others rendered. Reimbursement was on a per-hour basis and was contingent upon those submissions. The California Department of Social Services sent to the mother Forms W-2, on behalf of her daughter, listing the payments as compensation. This Court held that the adult daughter was the ultimate beneficiary of the State tax-exempt income, but payment of those funds to the mother was a payment for services received and taxable to the mother.

Here, the tax benefit does not stem from the nontaxable status of welfare benefits but, rather, from the section 131 exclusion for foster care payments received by foster parents.

The foster parents are the direct beneficiaries of the section 131 exclusion because that section was passed to encourage foster parents to accept foster children. The amendment of section 131 eliminated the need for expense record keeping and removed the limitation on the exclusion to reimbursed amounts. The changes represent a benefit to the foster parents. If no SSI payments had been received by the regional centers for the children in petitioner's SFH, petitioner would have received the exact same monetary amount from the regional centers as he received by getting the SSI funds. Consistent with respondent's concessions, if no SSI funds were received, the entire amount received would be non-taxable because the payments would have originated from State, rather than from Federal, funds.

The SSI payments here are "paid by a State or political subdivision thereof or by a placement agency" as reimbursement for care of foster children within the meaning of section 131. Those payments are excludable from taxable income under the provisions of section 131.

*Self-Employment Tax*

Petitioners argue that they are not subject to self-employment tax for any of the years in issue. For 1986, 1987, and 1988, petitioners argue that section 131 excludes foster care payments from gross income and, thus, those payments cannot be subject to self-employment tax. For 1985, petitioners argue that the foster care payments were "other income", not income from a trade or business, and, thus, that the payments are not subject to self-employment tax.

Sections 1401 and 1402 tax net earnings from self-employment. Self-employment is defined as gross income derived by an individual from any trade or business carried on by that individual. Sec. 1402(a). A trade or business has the same meaning as in section 162. Sec. 1402(c). The Supreme Court has interpreted the "trade or business" terminology of section 162 as follows: "the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit." *Commissioner v. Groetzinger,* 480 U.S. 23, 35 (1987); see also *Van Wart v. Commissioner,* 295 U.S. 112 (1935).

As to 1986, 1987, and 1988, by the plain language of section 1402(a), the SSI foster care payments received are not subject to self-employment tax. Section 1402(a) taxes only "gross income" from self-employment, and we have concluded that section 131 excludes SSI payments from gross income.

As to 1985, the excess of foster care payments over expenses is includable in gross income. We conclude that this excess is subject to self-employment tax. According to the legislative history, section 131, as in effect for 1985, was simply a codification of Rev. Rul. 77-280, 1977-2 C.B. 14. Absent special circumstances, a revenue ruling does not constitute authority for deciding a case in this Court; it merely represents the Commissioner's position with respect to a specific factual situation. *Stark v. Commissioner,* 86 T.C. 243, 250-251 (1986). Here, however, Rev. Rul. 77-280, *supra,* was cited in the legislative history of section 131, so it deserves particular scrutiny.

Rev. Rul. 77-280, *supra,* discussed the taxability of foster care payments in five different foster parent situations. The first two foster parent couples discussed in the ruling did not have a profit objective in taking the children into their homes; the second two foster parent couples did have a profit objective. The fifth foster parent was single, but the profit objective was not discussed as to that parent. The ruling stated, in the first four situations, that the excess foster care payments over actual expenses were includable in the foster parents' gross income. Although the self-employment tax consequences of codifying Rev. Rul. 77-280, *supra,* were not discussed in the legislative history of section 131, the ruling does address self-employment tax issues. The ruling stated that whether self-employment tax was imposed was dependent on the objective of the parents accepting foster children in their homes. If the parents were motivated by profit in accepting foster children (as in examples 3 and 4 of the ruling), moneys received that exceeded expenses were subject to self-employment tax because the foster parents were deemed to be in the trade or business of being foster parents.

The taxpayers in situation 3 in Rev. Rul. 77-280, *supra,* are similar to the case at hand. Situation 3 involved a married couple who entered into a formal agreement with a child-placement agency to provide foster care for four children. The placement agency agreed to pay compensation to

the parents, reimburse their actual housing expenses, and give them a standardized per-child support payment. The "compensation for services performed by the foster parents [with a profit motive] (including all reimbursements that exceed the relevant expenses) is gross income derived from a trade or business for purposes of the self-employment tax". *Id.* at 17. We agree with the rationale in the ruling.

Respondent here has determined that petitioner had a profit objective in running his SFH. Petitioners have the burden of proof on this issue. Rules 122(b), 142(a). The only evidence presented was that petitioners' tax return listed the foster care home as a Schedule C business, petitioner's wife moved to a separate residence in 1985, and, on bank loan applications signed by petitioners, they indicated that the foster care home was their only employment. We hold that petitioners are liable for self-employment taxes for 1985.

To reflect the foregoing and concessions by the parties,

*Decision will be entered under Rule 155.*