JONATHAN E. STROMME AND MARYLOU STROMME,
PETITIONERS *v*. COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 14706–09.          Filed March 13, 2012.

Ps owned two houses during the years at issue. They lived in one of those houses (on LaCasse Drive) and worked (but did not live) in the other house (on Emil Avenue). In the house on Emil Avenue they provided lodging for individuals with developmental disabilities. The county paid sums for the care of these individuals. Ps reported the amounts on their tax returns but then excluded them from income. *Held*: Ps cannot exclude the payments received to provide foster care under I.R.C. sec. 131 because they did not live in the house in which they provided lodging for the developmentally disabled adults.

*Jay B. Kelly*, for petitioners.
*Christina L. Cook*, for respondent.

COLVIN, *Chief Judge*: In 2005 and 2006 three (and then four) developmentally disabled adults lived in a house on Emil Avenue in Shoreview, Minnesota. The Emil Avenue house was owned by Marylou and Jonathan Stromme, who cared for their clients and managed the property. The local government paid them more than $250,000 in 2005 and more than $300,000 in 2006 for providing this foster care service. The Code makes these payments tax free if the clients were cared for in the Strommes' "home". But as discussed below the Strommes owned and resided in another home, and worked in, but did not live in, the house on Emil Avenue in Shoreview. Thus we hold that they may not exclude the foster care payments from income for the years at issue. [1]

### FINDINGS OF FACT

Judge Holmes, who was the trial Judge in this case, fully agrees with the findings of fact herein. The Strommes were Minnesota residents when they filed their petitions.

Marylou Stromme grew up as one of 10 siblings in a small home, and it was her relationship with one of her brothers, Danny, that inspired her vocation. Danny was developmentally disabled and, following the custom of the time, had been sent to live in an institution called the Lake Owasso Children's Home (which was later renamed the Lake Owasso Residence). Ms. Stromme stayed close to her brother, and from about the age of 12 began making regular weekend visits to the institution. Danny eventually was able to move in with the Strommes, and Ms. Stromme cared for him until his death in 2001.

The course of her brother's life left Ms. Stromme with a strong desire to help those with developmental disabilities. Before Danny died, she had become a board member of the Lake Owasso Residence. She had long been acquainted with the case managers there, and after Danny's death one of them suggested that she think about operating a group home—a smaller residence usually in a family-friendly community that contemporary thinking has concluded provides a better life for developmentally disabled adults than

---

[1] Unless otherwise noted, all section references are to the Internal Revenue Code (Code) in effect for the years at issue; all Rule references are to the Tax Court Rules of Practice and Procedure.

large congregate care. But where? At the time, Ms. Stromme and her husband Jonathan Stromme owned two houses in Shoreview: one on Mound Avenue and another on Emil Avenue. They lived at the Mound Avenue house with their children and had purchased the Emil Avenue house as an investment in April 2001.[2]

Petitioners chose to develop the Emil Avenue house as a group home. Mr. Stromme oversaw the extensive renovation of the Emil Avenue house. He added a fourth bedroom, a bathroom, and a living area in the basement and added a deck with a wheelchair ramp on the outside. He also sought the advice of a certified public accountant (C.P.A.), and then he and his wife started doing business as SISTER Group Home.[3] After the Strommes finished these preparations, the Ramsey County Human Services Department licensed them in 2003 as foster care service providers. The Emil Avenue house, with four bedrooms and an office area where the Strommes kept detailed records of client activities, was ready for business.

Ms. Stromme took charge of caring for the clients. Doctor's appointments were a constant, but the clients also went around town to "do everything like you would do as a normal person". She organized events for them such as making Easter baskets, painting, and mowing lawns—including the lawn at the Strommes' other house.[4] According to Ms. Stromme, she always had a client with her and the constant interaction was a "24/7 job".

To handle these client demands, the Strommes also had help. They hired six employees—most, including Jon and Molly, were family members, but at least one was not. These employees helped out both day and night. The sleeping arrangements, however, were tight; for part of 2005 there was an open bedroom, but for the rest of that year and 2006 the employees and the Strommes had to sleep on either the futon or the convertible sofa while they were on duty.

---

[2] For the years in issue, the Strommes had claimed the Emil Avenue house as their "homestead", affording them some real property tax relief. *See, e.g.*, Minn. Stat. Ann. sec. 273.1384, subdiv. 1 (West 2007).

[3] SISTER stands for Success in Special Needs Together Encouraging Residents.

[4] The reason for the last activity, according to the Strommes, was that a client "was 'compulsive' about mowing grass", and in fact had to be monitored or else would mow all the time.

Several neighbors saw the Strommes or their cars during the day. They saw them collecting mail there. And for all these neighbors knew, the Strommes lived there.

What the Emil Avenue neighbors did not seem to know was that the Strommes owned another house. The Strommes sold their Mound Avenue house in April 2003 and moved into the one they bought on LaCasse Drive in nearby Anoka County. It was at the LaCasse Drive house that the Strommes held family get-togethers and celebrated the safe return of another son from service in Iraq. The LaCasse Drive house was also where they celebrated Thanksgiving and Christmas. Ms. Stromme found it a more restful place to recover from foot surgery. This was in part because the LaCasse Drive house was much larger than the one on Emil Avenue. Excluding the basement, the LaCasse Drive house had 2,808 square feet, in contrast to the 1,168 square feet of the Emil Avenue house—and it was large enough to accommodate the Strommes' extended family and everyday life. Its six bedrooms often housed not only the Strommes and their two children, but also two other children from Ms. Stromme's first marriage, plus Ms. Stromme's brother, a niece, and two grandchildren. It also was large enough for the Strommes to bring their clients over for outings.

Four of respondent's witnesses—the Strommes' neighbors on LaCasse Drive—had a good grasp of where the Strommes spent their time during 2005 and 2006, better than the Emil Avenue neighbors. The LaCasse Drive neighbors also knew the Strommes owned two houses, and those neighbors understood that the Strommes worked at the Emil Avenue house. They frequently saw Ms. Stromme leave in the morning to go to work at the Emil Avenue house and then return in the evening. They often saw Mr. Stromme working in the yard or on his cars; they saw both Strommes bringing in groceries and noted Ms. Stromme's car was reliably in the driveway around dinnertime. They also credibly recounted scenes of the Strommes having ordinary suburban American fun, like returning from a Minnesota Wild hockey game or throwing a lively pool party—the Strommes had installed a pool in 2005. The pool was one of the LaCasse Drive house's great features, giving the Strommes, and sometimes their visiting clients, a place to relax.

The Strommes and their neighbors had some disagreements. We will not memorialize these in any great detail but only note that the resulting police reports show that the Strommes were present at the LaCasse Drive house and reported it as their residence.

In 2006 the Strommes separated. By November of that year they had sold the LaCasse Drive house—Mr. Stromme moved to a home in Forest Lake, Minnesota, and Ms. Stromme found her own place. The Strommes considered making the LaCasse Drive house a group home in lieu of selling it, though they were not licensed by Anoka County.

The State of Minnesota paid SISTER about $256,662 in 2005 and $305,561 in 2006. This enabled the Strommes, even after they took care of the Emil Avenue house and its clients, to pay the mortgage, the utilities, and the cost of improvements at the LaCasse Drive house.[5]

Respondent determined that the payments from the State of Minnesota were taxable.[6] After allowing the Strommes some business expense deductions, i.e., depreciation, employment and real estate taxes, interest, and wages, respondent determined deficiencies and penalties that totaled more than $140,000.

## OPINION

### I. *Section 131*

The Strommes claim eligibility under the section 131 exclusion from income of qualified foster care payments. Under that section, petitioners may exclude the 2005 and 2006 payments if they were:

- made pursuant to a foster care program of a State;
- paid by a State or political subdivision thereof, or a qualified agency; and

---

[5] The record is, for the most part, ambiguous about the exact cost of running SISTER Group Home. The Strommes drew less than bright lines between their personal expenses and the expenses of their clients. It is difficult for us to understand how certain expenses relating to trips to Mazatlan, Mexico, and to Treasure Island Resort and Casino in Welch, Minnesota, paid with SISTER's American Express card, aided the four developmentally disabled adults living at the Emil Avenue house.

[6] The Strommes did report some taxable business income on their 2005–06 returns: $10,632 from Ms. Stromme's windshield repair business and a separate payment to Ms. Stromme of $2,400 for adult foster care, which she did not explain at trial.

- paid to a foster care provider for the care of "a qualified foster individual in the foster care provider's home." [7]

*See* sec. 131(b)(1). The parties disagree about the third requirement. Does the phrase "foster care provider's home" merely require ownership, as petitioners contend; or does it mean the foster care must be provided in a taxpayer's residence, as respondent contends? We conclude that it means the foster care must be provided in a taxpayer's residence. [8]

A. *Ownership*

There are no regulations under section 131, and there is not much caselaw on the issue before us. [9] We explicate the meaning of "home" in section 131 by looking first to the text of the Code. If the meaning is plain, we generally enforce it according to its terms. *See, e.g.*, *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241–243 (1989). If the language is ambiguous, we can consider the legislative history. *See, e.g.*, *Cato v. Commissioner*, 99 T.C. 633, 640–641 (1992).

The only case on the meaning of "home" in section 131 is *Dobra v. Commissioner*, 111 T.C. 339 (1998). In *Dobra*, the taxpayers owned four houses where they cared for developmentally disabled people, but conceded that only one house was their "'personal family residence.'" *Id.* at 340. The Dobras nevertheless argued that because they owned each house, they could exclude payments tied to the individuals in all four. *Id.* at 342. We held, however, that under section 131 a person's "home" is where he resides. [10] "Put more plainly, in order for a 'house' to constitute * * * [a home], petitioners must live in that house." *Id.* at 345. Precedent fences us in:

---

[7] The sec. 131 requirements we list are those relevant to the Strommes' situation for the years at issue.

[8] We need not consider whether the foster care may be provided in a taxpayer's second home because in this case the care was not provided in petitioners' second home; the place the care was provided was not petitioners' primary or second home. For now, the better course is "to observe the wise limitations on our function and to confine ourselves to deciding only what is necessary to the disposition of the immediate case." *Whitehouse v. Ill. Cent. R.R.*, 349 U.S. 366, 372–373 (1955); *Ashwander v. TVA*, 297 U.S. 288, 345–346 (1936) (Brandeis, J., concurring); *accord Liverpool, N.Y. & Phila. S.S. Co. v. Emigration Comm'rs*, 113 U.S. 33, 39 (1885). Our silence on the issue should not be construed as our agreement with either party's argument.

[9] There is caselaw construing the phrases "paid by a State or political subdivision thereof or by a placement agency", *see Cato v. Commissioner*, 99 T.C. 633, 640–646 (1992), and "qualified foster individual", *see Micorescu v. Commissioner*, T.C. Memo. 1998–398.

[10] We also found that the legislative history of sec. 131 "provides little if any guidance to the meaning of 'home', for purposes of adult foster care, that cannot also be gleaned from the plain language of the statute." *Dobra v. Commissioner*, 111 T.C. 339, 344 (1998).

The Strommes' mere ownership of the Emil Avenue house is insufficient to make it their home.

### B. *Did the Strommes Live at the Emil Avenue House?*

It was easy enough to decide that the Dobras did not live in more than one of their houses—hired help provided the care—but the Strommes spent a lot of time at the Emil Avenue house in 2005 and 2006. Ms. Stromme had an office there, and that is where she kept records of the clients' daily activities. Their neighbors regularly saw the Strommes at the house and saw the Strommes' cars in the driveway. And respondent stipulated that the Strommes worked shifts at the Emil Avenue house.

These facts show the Strommes were frequently present at and worked at the Emil Avenue house, but is that enough? We conclude that using a house for business [11] does not make it a residence. We interpret the Code's use of the word "home" to mean the house where a person regularly performs the routines of his private life—for example, shared meals and holidays with his family, or family time with children or grandchildren.

The Strommes did argue that the Emil Avenue house was a home in this sense. They pointed to the bedroom available to them there early in 2005, and then to the living room couch and basement sofa once the fourth client moved in. But they did not dispute that the other six employees also slept in the same locations when their turns for night shifts came. The Strommes focused as well on the location of their clothes, claiming that they had two dressers in the basement, with additional clothes stored in the laundry room. [12] Mr. Stromme also said that when he needed to stay at the LaCasse Drive house to make improvements, he would carry over personal items in a duffel bag. [13]

---

[11] We do not read sec. 131 as prohibiting a profit motive.

[12] They also claimed that they received both personal mail (such as Christmas cards) and business mail at the Emil Avenue house; but the record contained specific examples of only the latter, some using the Emil Avenue address and others (e.g., tax documents and bank statements) the LaCasse Drive address.

[13] The fact that the Strommes homesteaded the Emil Avenue house, but not the LaCasse Drive house, also fails to convince us. The Strommes claimed that they could not homestead the LaCasse Drive house because it was not their home. We disagree. The Strommes listed the LaCasse Drive house as their principal residence on their 2003 Certificate of Real Estate Value filed with the State—rebutting their assertion. In fact, declaring the LaCasse Drive house their

Continued

The Emil Avenue neighbors either do not recall or never actually saw the living arrangements inside the Strommes' Emil Avenue house. And one of the Strommes' employees, Daniel Hess, testified that Ms. Stromme did not always sleep at the Emil Avenue house during the shifts he worked.

We have only the Strommes' word, but their unwillingness to admit that the LaCasse Drive house was even one of their "homes" casts serious doubt on their claim about living at the Emil Avenue house. The Strommes said they had a plan to make the LaCasse Drive house a group home, which limited their use of that house during the years at issue to visits with their children, repair work, and outings with their clients. They want us to believe that they did not eat lunch or dinner at the LaCasse Drive house and that Mr. Stromme slept there only when he needed to do repairs.

Their actions do not match their words. The Strommes received a license from Ramsey County for the Emil Avenue house in a mere six months, even though they had to remodel the entire basement. In contrast, they never applied for a similar license from Anoka County during their more than three years at the LaCasse Drive house. And while their neighbors did see the Strommes working at the LaCasse Drive house, they also saw them doing everyday chores, from bringing in groceries and eating meals with the family to hosting late-night pool parties. Their neighbors on LaCasse Drive credibly testified that the Strommes said that they "worked" at Emil Avenue. We believe that admission and find that the Strommes lived at the LaCasse Drive house. It was a big house, with plenty of amenities. It was where they spent time with their children and grandchildren. It was the house where they lived their private life, while they worked at the Emil Avenue house. We therefore find that the LaCasse Drive house was their only home.[14] The

homestead was not in their financial interest. The Emil Avenue house was eligible for the homestead tax credit, but the LaCasse Drive house was not. The Strommes bought the LaCasse Drive house for $415,000 and the Emil Avenue house for $123,000. The homestead tax credit is phased out completely for property valued over $413,000. *See* Minn. Stat. Ann. sec. 273.1384, subdiv. 1 (homestead credit equal to 0.4% of the first $76,000 of the property value minus 0.09% of the excess of $76,000).

[14] Although the Strommes sold the LaCasse Drive house in November 2006, it is unclear exactly when, and for where, Marylou Stromme left. Mr. Stromme claimed she went to the Emil Avenue house. A LaCasse Drive neighbor remembered Ms. Stromme's moving to the Floral Bay Drive house. We do not know where the Strommes' children moved. Without support for the position that Ms. Stromme in fact moved to the Emil Avenue house in 2006, *see* Rule 142(a), we cannot allow her an exclusion for even part of the year.

payments that they received from the State of Minnesota in 2005 and 2006 are therefore taxable income.

## II. *Accuracy-Related Penalty*

Respondent also determined that the Strommes are liable for the penalty under section 6662(a) for each year in issue, claiming that the Strommes' exclusions of the foster care payments were negligent or in disregard of rules or regulations or led to substantial understatements of income tax. *See* sec. 6662(b)(1) and (2). Negligence, as the regulations define it, is the failure to make a reasonable attempt to prepare one's tax returns, keep adequate books and records, substantiate items properly, or otherwise comply with the Code. Sec. 1.6662–3(b)(1), Income Tax Regs. Disregard of rules includes careless, reckless, or intentional disregard of Code provisions or regulations. Sec. 1.6662–3(b)(2), Income Tax Regs. And an understatement of income tax is substantial if it is more than $5,000 or 10% of the tax required to be shown on the return, whichever is greater. Sec. 6662(d)(1)(A).

Respondent has met his burden of production for at least the substantial understatement ground by producing the income tax returns reflecting the error. *See* sec. 7491(c); *Campbell v. Commissioner*, 134 T.C. 20, 29 (2010), *aff'd*, 658 F.3d 1255 (11th Cir. 2011). The amounts excluded resulted in substantial understatements of income tax—since the Strommes did not report any taxable income for 2005 and 2006.

But there is a reasonable cause and good faith defense to the penalty irrespective of whether it is based on negligence, intentional disregard, or a substantial understatement of income tax. *See* sec. 6664(c)(1). We find, taking into account all the relevant facts and circumstances, that the Strommes had reasonable cause for the positions taken on their returns and acted in good faith. *See id.*; sec. 1.6664–4(b)(1), Income Tax Regs. The Strommes reported the amounts of the receipts on their returns, albeit not as taxable income. They met all the other requirements of section 131. And while *Dobra* defines "home" as a "residence", the Strommes' situation was arguably different—the Dobras never litigated the question of whether they lived in more than one home. IRS

publications do not even try to define what a "home" is in describing the foster care exclusion. Given the ambiguity in this area of the law, we find the Strommes' confusion reasonable and honest. *See Higbee v. Commissioner*, 116 T.C. 438, 449 (2001) (noting that an honest and reasonable misunderstanding of fact or law weighs against imposing an accuracy-related penalty) (citing section 1.6664–1(b)(1), Income Tax Regs.). On the basis of these facts, particularly the Strommes' honest attempts to calculate their tax liabilities, we therefore find that the Strommes had reasonable cause to take the reporting position that they did.

Respondent counters that there are clear indicators the Strommes did not act in good faith. Respondent notes they failed to produce records to substantiate their foster care expenses and failed to substantiate when the fourth client came to the Emil Avenue house. Respondent also suggests that the Strommes relied on their C.P.A. to create a section 131 "facade". The Strommes, however, did keep records. And the date that the fourth client entered the group home would not have changed the character of payments.

We therefore reject respondent's determination that the Strommes owe accuracy-related penalties.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

COHEN, HALPERN, FOLEY, VASQUEZ, GALE, THORNTON, MARVEL, GOEKE, WHERRY, KROUPA, HOLMES, GUSTAFSON, PARIS, and MORRISON, *JJ*., agree with this opinion of the Court.

---

HOLMES, *J*., concurring: I agree with nearly everything in the opinion of the Court, except where it states that the Commissioner argues that the phrase "foster care provider's home" means that "foster care must be provided in a taxpayer's residence". *See* op. Ct. p. 218. That's not *exactly* what the Commissioner was arguing—in his brief and at trial, he argued that the phrase "foster care provider's home" means that foster care must be provided in a taxpayer's *principal*

residence. *See, e.g.*, Answering Br. for Respondent 24; Pretrial Memorandum for Respondent 8.

It is our failure to engage that argument that compels me to write separately.

## I.

The Commissioner argued throughout this case that the Emil Avenue house needs to be the Strommes' principal residence for section 131 to apply. He points to section 121's home-sale exclusion,[1] and reads *Dobra* as excluding foster care payments from income only if the taxpayers provide care in their principal home.[2] The Strommes even went along with this and argued that the Emil Avenue house was their primary residence.

I do not think that the Strommes had to argue quite so vociferously (and unconvincingly) because I disagree with the argument that "home" under section 131 means only a taxpayer's principal residence. We held in *Dobra* that "in ordinary, everyday speech, the phrase * * * [foster care provider's home] means the place (*or places*) where petitioners reside." *Dobra v. Commissioner*, 111 T.C. 339, 345 (1998) (emphasis added). As support for our reading, we looked elsewhere in the Code. *See id.* at 348. Section 2(b)(1), for example, says that a head of household has to "maintain[ ] as his home a household which constitutes for more than one-half of such taxable year the principal place of abode * * * of * * * a qualifying child * * * [or] a dependent." The Ninth Circuit has held that this language does not limit a taxpayer to having only one home. *See Dobra*, 111 T.C. at 347 (discussing *Smith v. Commissioner*, 332 F.2d 671 (9th Cir. 1964), *rev'g* 40 T.C. 591 (1963)); *see also Muse v. United States*, 434 F.2d 349, 353 (4th Cir. 1970). Acknowledging the Ninth Circuit's decision, we clarified in *Dobra* that the rel-

---

[1] Section 121 excludes gain from the sale of a principal residence. If a taxpayer owns two residences, he can apply section 121 to only one—the one, in light of the time he spends there during the year and other relevant factors, that is his *principal* residence. *See* sec. 1.121–1(b)(2), Income Tax Regs.

[2] The Commissioner took the one-home approach in a 1994 Technical Advice Memorandum. *See* Tech. Adv. Mem. 9429004 (July 22, 1994). We don't give Technical Advice Memoranda any more deference than we would a litigating position taken by the Commissioner. *See* sec. 6110(b)(1)(A), (k)(3); *CSI Hydrostatic Testers, Inc. v. Commissioner*, 103 T.C. 398, 409 n.10 (1994), *aff'd*, 62 F.3d 136 (5th Cir. 1995).

evant inquiry for a "home" is whether the taxpayer resided in the house at issue. *See Dobra*, 111 T.C. at 348.

We recently had another chance to construe a Code section where Congress used the word "home" without nailing "principal" to it. *See Driscoll v. Commissioner*, 135 T.C. 557 (2010), *rev'd and remanded*, 669 F.3d 1309 (11th Cir. 2012). According to the Code, a minister of the Gospel doesn't include in income the "rental value of a home furnished to him as part of his compensation." Sec. 107(1). Driscoll's congregation provided him with two houses. Driscoll excluded payments associated with both from his income, but the Commissioner allowed the exclusion only for his principal residence. *See Driscoll*, 135 T.C. at 558–559. We disagreed: We read section 107 as applying to compensation in the form of a dwelling house; and since the parties had stipulated that the Driscolls' second house was also Driscoll's "residence", we found that it too was covered by the plain meaning of the statute. *See id*. at 566.

In my view, *Driscoll* supports *Dobra*: A home is where one resides. And because a taxpayer may reside in more than one house, section 131 does not limit him to only one "home". But *Driscoll* was also controversial: It carried only by a seven-to-six vote. *See id*. at 567, 573. It was reversed by the Court of Appeals for the Eleventh Circuit, which is not where this case would be headed.

## II.

Therein is the explanation for why this case, like *McLaine v. Commissioner*, 138 T.C. 228 (2012), also filed today, ended up in conference: a reluctance to include in the opinion supporting our decision a fuller explanation of why we're doing what we do.

The audience for our opinions should note a decided lack of majority support, especially after *Driscoll*, in actually defending the Commissioner's position that a taxpayer who provides foster care in his home may exclude payments only if (or maybe to the extent that) he provides that care in his *principal* home. Not only did we implicitly reject that point in *Dobra*, but as mentioned above, *Dobra* itself built on cases like *Smith v. Commissioner*, 332 F.2d at 673, holding that

"[a] person can have but one domicile, but we see no reason why a person cannot have two homes."

Once we decided *Driscoll*, which would seem to have been a harder case—the Code section there *does* use the singular "a home"—it seems odd not to mention it in *Stromme*. And if a minister can own more than one "a home," surely a foster-care provider can provide care in more than one "taxpayer's home." Unless, of course, we want to go back on *Dobra*'s holding that "home" means "residence" and challenge the Ninth Circuit's similar construction of section 2(b) by adopting a different rule of construction to require us to insert "principal" or "at most one" before "home" where the Code uses that word, or maybe to interpret "home" to mean "domicile".

In one way, of course, *Driscoll* is directly on point: The opinion of the Court there held that the rule of construction in current section 7701(p)(1) (cross-referencing title 1 of the U.S. Code) applies, and tells us to treat singular nouns as including plural. *See Driscoll*, 135 T.C. at 565 (citing prior version at section 7701(m)(1)). Judge Gustafson nevertheless argues, as he did in his *Driscoll* dissent, that "home" has a connotation of singularity, that one can only use one house at a time. *See* Gustafson op. pp. 227–228.

In *Driscoll* he had further argued that allowing the parsonage allowance for more than one home served no legislative purpose. *See Driscoll*, 135 T.C. at 569–571. Noting the phrase "to the extent used by him to * * * provide a home," in section 107(2), he suggested a reading that would require a minister to allocate his rental allowance among his homes with only a part excluded. *See id.* at 571.

One can be sure that this part of Judge Gustafson's dissent in *Driscoll* does not apply to section 131. Not only does the phrase "to the extent" not occur in section 131, but the legislative history runs directly opposite:

The recordkeeping necessitated by present law requires prorating such expenses as housing and utility costs as well as expenditures for food. The committee believes that the requirement of such detailed and complex recordkeeping may deter families from accepting foster children or from claiming the full exclusion from income to which they are entitled. [H.R. Rept. No. 99–426, at 863 (1985), 1986–3 C.B. (Vol. 2) 1, 863.]

The aim of the amendment was to help taxpayers afford the advantages of a home life to children or the disabled in need. And it seems obvious that a family can have more than one home. If not, how would we possibly analyze in any reasonable way, situations like:

• a down-on-its-luck family that moves with its foster children among several homes during the course of the year; or

• a family where one spouse moves with a small child to the family's summer home, while the other stays with the school-age children at their principal residence; or

• a minister's family that shuttles between the various homes whose expenses we've already decided are all subject to exclusion in *Driscoll*?

As it turns out, there is no majority to take this reasoning on, only a simple reluctance to rule against the Commissioner on one point when he wins on another. A similar reluctance is at work in *McLaine*, but it's not one I think it wise for us to indulge in as a general matter. Judge Halpern, in his concurrence in *McLaine*, lists the advantages of alternative holdings where there's a reason for reaching alternative arguments. As trial Judge here, I faced the related problem of a bad argument in support of the winning side. The Commissioner raised the argument, and the presence of the still-outstanding Technical Advice Memorandum 9429004 (July 22, 1994), *see supra* note 2, suggests that the Commissioner will continue to do so until there's authority to the contrary. Proposing to address it was not gratuitous, but a reasonable progression from *Dobra* (home means residence, not ownership) to *Driscoll* (home includes two houses that the parties stipulated were residences) to *Stromme*—where one party relied on the legal argument that only principal residences are homes, but presented lots of evidence on the factual issue that the house in question wasn't a residence at all.

The answer to the legal question seemed pretty obvious, and would clear up this tiny, murky corner of the Code a bit. *See, e.g.*, *Ashcroft v. al-Kidd*, 563 U.S. ___, ___, 131 S. Ct. 2074, 2080 (2011) (court has discretion to correct errors at each step of two-step analysis). We did the same thing in *Dobra* itself, where we held for the Commissioner, but also rejected his definition of "foster care provider's home" as meaning "the family residence of a licensed foster care pro-

vider in which the licensee is the primary provider of foster care." *Dobra*, 111 T.C. at 342–343.

It seems odd to have the Court sit in conference on cases where there's no disagreement on the result, and the only articulated dispute on the underlying legal questions reiterates a dissent from an earlier case decided differently. It is clearly prudent and justified for any Judge not to reach out and analyze tangential issues, or even especially controversial issues, but as in *Mitchell v. Commissioner*, 131 T.C. 215 (2008), *discussed in Koprowski v. Commissioner*, 138 T.C. 54, 66 (2012) (Holmes, J., concurring), so today in *McLaine* and *Stromme*, we take this counsel of prudence imprudently far: A home-plate umpire shouldn't be opining on the theoretical applicability of the infield-fly rule, but surely he can tell the catcher that, though the pitch was outside, at least it was above the knees.

————————————

GUSTAFSON, *J.*, concurring: I agree with the opinion of the Court. I write separately here to address the concurring opinion of Judge Holmes, who proposes we should hold that a foster parent may have two "homes" under section 131. I disagree for two reasons:

First, we manifestly did not need to reach this issue in order to decide this case. Section 131 excludes from income payments made "to the foster care provider for caring for a qualified foster individual in the foster care provider's home." A trial was conducted, and the evidence yielded a finding of fact (with which Judge Holmes fully agrees) that the Emil Avenue house was not the petitioners' "home". The opinion of the Court reaches this conclusion without having to consider whether section 131 contemplates that a foster parent may have two "homes" or instead permits only one. Judge Holmes suggests that one should note "a decided lack of majority support" for a one-"home"-only interpretation of section 131, *see* Holmes op. pp. 224–225; but in fact one should note instead simply that the majority found it unnecessary even to reach this interpretive question, which is not really implicated here.

Second, if we were required to reach that question, I would conclude that the statutory phrase "in the foster care pro-

vider's *home*" does not mean "in *one of* the foster care provider's *homes*". Rather, as I observed before in another context,

In common usage, a person has one "home",[2] and the word therefore has a connotation of singularity.

[2] The leading (non-obsolete) definition of "home" in the *Oxford English Dictionary* (1933) is "A dwelling-place, house, abode; the fixed residence of a family or household; the seat of domestic life and interests; one's own house; the dwelling in which one habitually lives, or which one regards as one's proper abode"; and the first definition for "home" in Webster's Third New International Dictionary (1966) is "the house and grounds with their appurtenances habitually occupied by a family : one's principal place of residence : DOMICILE".

[*Driscoll v. Commissioner*, 135 T.C. 557, 569–570 (2010) (Gustafson, J., dissenting), *rev'd and remanded*, 669 F.3d 1309 (11th Cir. 2012).]

The most that can be said for the multiple-"homes" position is that the statute might be ambiguous—i.e., that the apparently singular "home" might actually mean the plural "homes". But if the statute is ambiguous, then we must interpret it in light of the elementary principle "'that exclusions from income must be narrowly construed.'" *Commissioner v. Schleier*, 515 U.S. 323, 328 (1995) (*quoting United States v. Burke*, 504 U.S. 229, 248 (1992) (Souter, J., concurring)). The narrower construction here—and the one I would adopt—is that "home" means one home.

COLVIN, GOEKE, and KROUPA, *JJ*., agree with this concurring opinion.