JOHN J. McLAINE, PETITIONER *v*. COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 15932–07L.      Filed March 13, 2012.

In 1999 P exercised nonqualified stock options (NQOs) previously issued to him by E, his recent employer, and simultaneously sold the option stock, receiving from E the sale proceeds, less the exercise price, undiminished by withheld income taxes. P reported the gain but did not pay the balance shown as due on his return. R issued a notice of intent to levy to collect the balance, interest, and additions to tax for failures to pay tax and estimated tax. P had a collection due process hearing, and R's Appeals Office determined to proceed with collection. P challenges the determination primarily on

228

the ground that he is entitled to a credit under I.R.C. sec. 31 for payment by a successor to E in a later year of the tax due on his 1999 option gain.

1. *Held*: P is not entitled to a credit under I.R.C. sec. 31 for any payment after 1999 by E or a successor of E of the taxes associated with P's 1999 NQO exercise because no payment was made by E or a successor to E of the nonwithheld taxes related to the 1999 exercise.

2. *Held*, *further*, the Appeals officer did not abuse his discretion by refusing to consider collection alternatives.

3. *Held*, *further*, P is not entitled to any abatement of interest.

4. *Held*, *further*, P is liable for the additions to tax assessed under I.R.C. secs. 6651(a)(2) and 6654.

5. *Held*, *further*, Appeals' determination to proceed with collection of the assessments against P for 1999 is sustained.

*James R. Walker* and *Christopher D. Freeman*, for petitioner.

*Frederick Lockhart* and *Sarah Barkley*, for respondent.

COLVIN, *Chief Judge*: This case is before us to review a Notice of Determination Concerning Collection Action(s) under Section 6320 and/or 6330 (notice) issued by respondent's Appeals Office. The notice concerns petitioner's 1999 Federal income tax, and it sustains an Appeals officer's determination that respondent may proceed by levy to collect that tax. We review the notice pursuant to section 6330(d)(1).[1]

The events giving rise to the notice begin with petitioner's exercise in 1999 of nonqualified stock options (NQOs) awarded to him by a previous employer. Petitioner realized gross income on the exercise of the NQOs, which he and his then wife reported on their 1999 joint Federal income tax return (1999 return). On that return petitioner reported no Federal income tax withheld and a substantial amount of unpaid tax due, which, along with additions to tax and interest, respondent now seeks to collect.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all dollar amounts to the nearest dollar.

The issues for decision are:

(1) whether respondent's Appeals Office erred in not giving petitioner credit for a third-party payment of his 1999 income tax liability. We hold that respondent did not err;

(2) whether respondent's refusal to provide collection alternatives as described in section 6330(c)(2)(A)(iii) was an abuse of discretion. We hold that it was not;

(3) whether petitioner is entitled to partial abatement of assessed interest. We hold that he is not;

(4) whether petitioner is liable for the additions to tax for failure to pay tax under section 6651(a)(2) and for failure to pay estimated taxes under section 6654. We hold that he is; and

(5) whether Appeals' determination to proceed with collection of the assessments against P for 1999 is sustained. We hold that it is.

FINDINGS OF FACT

*Introduction*

Some of the facts have been stipulated and are so found. Petitioner resided in Colorado when he filed the petition. Judge Halpern, who was the trial Judge in this case, fully agrees with these findings of fact.

*Personal History*

Petitioner was born in 1949. He has a bachelor's degree in business from the University of Scranton and a master's degree in business administration from DePaul University. He married Tammy McLaine in 1997, and they were divorced in 2004. We refer to her herein as petitioner's former spouse.

*Employment by Excel*

During the early to mid-1990s, Excel Communications, Inc. (Excel), was a privately held company in the business of selling and reselling telephone services. Initially, petitioner worked as a consultant to Excel. In 1994 he was hired as an employee by Excel and became a senior vice president and its chief financial officer (CFO).

After it hired petitioner, Excel experienced rapid growth. Its sales grew from $1.5 million in 1993 to more than $1 bil-

lion in 1996, and its workforce grew from 20 to over 6,000 employees.

In 1996 petitioner was part of the management team that took Excel public.

In 1997 Excel acquired Telco, a Virginia-based long-distance telecommunications company. Also in 1997, after the Telco acquisition, petitioner was promoted to president and chief operating officer of Excel, but he continued as its CFO. In April 1998, on account of a disagreement as to the future of Excel, petitioner left its employment.

Throughout his employment by Excel, petitioner's ever-increasing roles and responsibilities, coupled with his lack of personal time, resulted in his operating in a highly stressful and volatile business environment.

*Exercise of NQOs*

During the time petitioner was employed by Excel, it awarded him NQOs pursuant to its stock option plan (plan). Petitioner became entitled to exercise those options when he left Excel. The plan required that an optionee who exercises an option "shall, upon notification of the amount due * * * pay to the Company * * * amounts necessary to satisfy applicable federal, state and local tax withholding requirements."

Teleglobe, Inc. (Teleglobe), a subsidiary of Bell Canada Enterprises (BCE), acquired Excel in 1998. As a result, petitioner's Excel NQOs became exercisable in Teleglobe stock. Petitioner exercised some of those options in December 1998 and the balance in January 1999. With respect to the options exercised in 1999 (together, 1999 exercise), petitioner elected an alternative under the plan that required Excel/Teleglobe to immediately sell the option shares and remit to him the excess of the proceeds of sale over the exercise price (option proceeds or spread amount). Petitioner received $8,367,951 as a result of the 1999 exercise and that election.

Paine Webber, the brokerage firm appointed to administer the plan, facilitated the 1999 exercise. Petitioner received from Paine Webber Forms 1099–B, Proceeds From Broker and Barter Exchange Transactions, listing the gross proceeds from the 1999 exercise. Those forms were the source for the amounts petitioner and his former spouse reported on the

1999 return. Excel/Teleglobe mailed a Form 1099–MISC, Miscellaneous Income, to petitioner at a post office box in Colorado, reporting $8,384,044 of miscellaneous income. Petitioner did not receive that form.

When petitioner received the option proceeds, he knew that no taxes had been withheld. Petitioner received no notification from Excel/Teleglobe of any tax amounts due to it from him as a result of the 1999 exercise, nor has he reimbursed it any amount for taxes it paid with respect to that exercise.

*Disposition of the Option Proceeds*

Petitioner returned most of the proceeds from the 1999 exercise and stock sales to Paine Webber for investment in high technology stocks, including WorldCom. He invested the remainder in limited liability companies, including a home construction company, an online auction house, and a venture capital firm. All of those investments either failed or resulted in substantial losses with the result that petitioner was left with only a small fraction of his option proceeds by October 20, 2000, the filing date of his 1999 return. Between April 15 and October 20, 2002, he tried to raise funds sufficient to pay his 1999 tax liability by attempting, unsuccessfully, to borrow against or to sell his Colorado and Florida homes.

*The 1999 Return*

Petitioner reported the option proceeds on Schedule D, Capital Gains and Losses, of the 1999 return.

Petitioner and his former spouse reported total taxable income of $8,347,585, tax due of $3,276,333, no amount of income tax withholding, total payments (with the request for extension of time to file) of $1,600,000, and an amount owed of $1,676,333, which was not remitted with the return. They had obtained an automatic four-month extension of time to file and an additional two-month extension, to October 15, 2000. They filed the 1999 return on October 20, 2000.

At the time petitioner and his former spouse filed the 1999 return, neither Excel nor Teleglobe had remitted any tax to the Internal Revenue Service (IRS) on petitioner's behalf for 1999. Petitioner was uncertain, at that time, whether that was the case.

*Respondent's Assessments for 1999*

Respondent's account transcript, Form 4340, Certificate of Assessments, Payments and Other Specified Matters, for petitioner's 1999 taxable year shows petitioner's $1,600,000 tax payment to have been made, in part, on July 17, 2001 ($1,500,000), and in part on October 22, 2001 (the balance of $100,000, as an application of an overpayment for 2000), rather than on April 15, 2000, with the request for extension of the return filing date.

On the basis of information provided in the 1999 return and the nonpayment of the reported amount due, on December 18, 2000, respondent assessed the $3,276,333 reported income tax liability and additions to tax of (1) $101,872 for failure to pay estimated taxes and (2) $147,435 for failure to pay tax timely. On November 21, 2005, respondent assessed an additional failure-to-pay addition to tax of $442,648.

*Relief From Joint Liability for Petitioner's Former Spouse*

Petitioner and his former spouse were divorced in 2004. Thereafter, she requested and received relief from joint liability with respect to the 1999 return. As a result, on March 10, 2008, respondent reversed the assessed debit balance of $2,084,961 in petitioner's and her joint account with respondent and transferred it to petitioner's separate account with respondent.

*The Collection Due Process Hearing*

On June 26, 2006, respondent sent petitioner a Letter 1058A, Final Notice of Intent To Levy and Notice of Your Right to a Hearing, with respect to petitioner's 1999 Federal income tax, seeking $2,265,589 as the "Unpaid Amount from Prior Notices" and $924,141 in additional interest, for a total of $3,189,730. In response, petitioner submitted a Form 12153, Request for a Collection Due Process Hearing, requesting consideration of collection alternatives, including an offer-in-compromise and a partial payment installment agreement.

In March 2007 Appeals Officer Michael Jeka conducted a face-to-face hearing with petitioner's counsel, followed by additional phone conferences and correspondence. Petitioner

argued at the hearing and in subsequent correspondence with Mr. Jeka that his 1999 tax liability had been assessed against and paid by Excel or Teleglobe and that he was entitled to a credit for that third-party payment (or for withholding without payment) of his 1999 tax liability. Mr. Jeka and petitioner's counsel also discussed (1) the possibility of respondent's accepting an offer-in-compromise from petitioner or the execution of an installment agreement to the extent of petitioner's tax liability and (2) petitioner's defense, based on alcoholism, against the imposition of additions to tax.

Mr. Jeka was unable to confirm from respondent's computer records that Excel had withheld taxes from the payments associated with the 1999 exercise or that either Excel or Teleglobe had subsequently paid those taxes. Mr. Jeka declined to consider any collection alternatives (an offer-in-compromise or an installment agreement) because petitioner had not submitted either an offer-in-compromise or supporting financial information after obtaining repeated extensions of time to do so, and he rejected petitioner's alcoholism defense to the assessed additions to tax on the basis of his reading of applicable caselaw.

Subsequently, in June 2007 respondent mailed to petitioner the notice sustaining the proposed collection action.

*Petitioner's Alcoholism*

Petitioner has had a problem with excessive consumption of alcohol at times. Petitioner stopped drinking in 1993 but resumed in 1997.

Petitioner's drinking gradually increased after he left Excel's employment in 1998, and, in particular, from 1999 to 2001 when his investments turned sour. By 2000 he recognized that he had a drinking problem. Nevertheless, his drinking continued to increase so that by mid-2001 he was drinking throughout the day, including during breaks at business meetings and late at night, or throughout the night, by himself. As a result, he began to have trouble managing his personal affairs such as timely payment of bills and mortgage obligations. Despite those problems he was asked to and did take over the management of a venture capital firm in September 2001.

Subsequently, petitioner tried to stop drinking for a time with intermittent success. Petitioner checked himself into the Betty Ford Center (Center) in Rancho Mirage, California, in the summer of 2002. He was admitted with a diagnosis of alcohol dependence. Notes from his physical examination indicate his general appearance as: "Bright and alert male in no distress". His mental status is noted: "Affect is normal. Orientation is normal. Memory is normal." He was discharged in October 2002, and he no longer drinks alcohol.

*The Excel Employment Tax Audit and Appeal*

Respondent conducted an employment tax audit of Excel and its subsidiaries (without distinction, Excel or, sometimes, Excel group) for 1998 and 1999. In relevant part, the examining agent's proposed adjustments concerned Excel's treatment of the option proceeds and the proceeds from NQOs exercised by two other Excel executives (NQO exercise issue). The agent took the position that all three individuals should have been treated as employees receiving wages as a result of their exercises of their respective NQOs, with the result that a member of the Excel group was liable for income, Federal Insurance Contributions Act (FICA), and Federal Unemployment Tax Act tax withholding payments that it had not made in connection with the NQO exercises. The agent's report for an Excel subsidiary, Excel Management Service, Inc. (Excel Management Service), for 1999, reflected a proposed adjustment for additional FICA taxes of $463,193 and additional income tax withholding of $4,211,453. The basis for those proposed adjustments was the agent's recharacterization—from nonemployee compensation to employee wages—of all of the option proceeds received by the three executives.

Subsequently, Excel, represented by Ernst & Young L.L.P., protested to the IRS Appeals Office the agent's proposed adjustments. The Appeals officer stated his findings and recommendations in his Appeals Transmittal and Case Memo, plus attachments, dated September 1, 2005. They were to reduce the agent's proposed imposition of employment taxes so as to impose only the Medicare portion of the FICA taxes on the option proceeds received by the three executives. With

respect to those proceeds, the Appeals officer stated as follows:

The payments to the * * * three workers were in the nature of stock options * * * [The issue] is * * * whether the exercise of nonqualified stock options caused these executives to have compensation subject to employment taxes. Each of the workers changed their status into independent contractors; the taxpayer claims that at the time the options were exercised they were not corporate officers but independent contractors.

Robinson and Hamrick filed returns and paid all the related income taxes. McClaine [sic McLaine] was the Chief Financial Officer and filed for both years but he has an outstanding balance for 1999.

I propose government concede backup withholding and FICA but leave the medical [sic] wages [i.e., the proposed adjustment for failure to withhold and pay Medicare taxes] in-place.

Later in his writeup of the NQO exercise issue, the Appeals officer made the following additional comments:

Dan Robinson has filed his 1998 and 1999 returns reporting the income as something other than wages. John McClaine [sic] has filed his 1998 and 1999 returns but has an unpaid balance for 1999. Jerry Hamrick has filed his 1998 return reporting the income as something other than wages.

All three earned wages in each of the years in excess of the FICA limits and two paid the income taxes corresponding to the option income. The taxpayer proposed that the option wages be applied to the Hospital Insurance portion of the employment taxes[.]

The taxes as proposed by Compliance with respect to McClaine [sic] will be left unchanged.

Previously, on May 12, 2005, the CFO of Excel Management Service executed, on behalf of that corporation, a Form 2504, Agreement to Assessment and Collection of Additional Tax and Acceptance of Overassessment (Excise or Employment Tax), in which the corporation agreed to the immediate assessment and collection of only the 1999 Medicare taxes, totaling $282,024 ($70,506 per quarter), attributable to the option proceeds received by the three executives.

On September 23, 2005, respondent made four assessments of $70,506, one for each quarter of calendar year 1999. No other tax assessments appear on the 1999 employment tax transcripts (Forms 4340) for Excel Management Service. Those transcripts also indicate that the four assessments, plus the assessed interest thereon, remained unpaid as of May 12, 2009.

*Teleglobe and VarTec Bankruptcies and Arbitration*

In April 2002 Teleglobe sold Excel and certain other subsidiaries to VarTec Telecom, Inc. (VarTec).

In December 2003, VarTec filed claims against Teleglobe (which had previously filed for bankruptcy) for obligations of the Excel group (allegedly arising before VarTec's acquisition of the Excel group), including a claim for the Excel group's potential liability for employment taxes occasioned by the 1999 exercise. At the time of the trial in this case, VarTec's legal representatives did not know whether anyone had paid those taxes to the Commissioner.

In December 2002 VarTec had sued BCE (Teleglobe's parent) concerning claims against Teleglobe, which included VarTec's potential liability for Excel's failure to withhold taxes occasioned by the 1999 exercise. That suit ultimately resulted in either an arbitration award or a mediation award to VarTec. The arbitrator rendered his decision in October 2004. Subsequently, the parties settled their dispute (although the terms of the settlement are not clear from the record).

In November 2004 VarTec and its subsidiaries, including the Excel group, filed for bankruptcy protection in the U.S. Bankruptcy Court for the Northern District of Texas (VarTec bankruptcy).

*The Commissioner's Proofs of Claim*

In the Teleglobe bankruptcy the Commissioner filed a proof of claim in June 2004 in the amount of $17,374,212 against one of the Teleglobe entities. The Commissioner's proof of claim included two "WT–FICA" claims for 1999 of $1,742,070 and $7,030,569, both listed as "pending assessment".

In the VarTec bankruptcy, the Commissioner also filed three proofs of claim against Excel Management Service, in November 2004 and in August and October 2005, respectively. The first, in the amount of $14,187,441, included a "WT–FICA" claim for 1999 of $7,030,569, listed as an "unassessed liability". The second, in the amount of $622,448, amended the first claim and included "WT–FICA" claims of $70,506 for each quarter of 1999 ($282,024, in total, for 1999). Those amounts were agreed upon at the conclusion of Excel's appeal of its employment tax audit; they were

assessed on September 23, 2005, but were listed in the second proof of claim as "unassessed" liabilities. The third proof of claim, stating a claim of $622,449, included "WT–FICA" claims of $35,253 for each quarter of 1999, which were also listed as "unassessed" liabilities.

The $17,374,212 proof of claim filed in the Teleglobe bankruptcy was "disallowed and expunged" by the Delaware Bankruptcy Court in June 2005.

## OPINION

### I. *The Parties' Arguments*

#### A. *Constructive Withholding*

Petitioner contends that VarTec paid the taxes associated with the 1999 exercise in 2004 or 2005. He offers as proof that the Commissioner voluntarily reduced his proof of claim in the VarTec bankruptcy. He points out that, by way of the August 2005 amended proof of claim against Excel Management Service, the Commissioner reduced the claim in his original November 2004 proof of claim from $14,187,441, including a "WT–FICA" claim for 1999 of $7,030,569, to a claim of $622,448, including only $282,024 of "WT–FICA" claims for 1999. Petitioner argues: "The IRS' voluntary reductions in its proofs of claim against Excel is corroborative of Petitioner's assertion that his 1999 income tax liability was ultimately paid, subsequent to the VarTec/Teleglobe arbitration, but also pursuant to the IRS audit of Excel."

Petitioner supports that argument by arguing that the Appeals officer who handled Excel's appeal in connection with the NQO exercise issue sustained the agent's audit adjustment with respect to petitioner. He bases that argument on the Appeals officer's statement that the agent's proposed adjustment "with respect to * * * [petitioner] will be left unchanged." Presumably, the thrust of that argument is to demonstrate that respondent never intended to waive his claim against Excel and its successor corporations for the taxes associated with the option proceeds.

Necessarily conceding that any payment by VarTec of an amount that should have been (but admittedly was not) withheld from the option proceeds could not constitute an actual withholding from those proceeds, petitioner argues that,

nonetheless, he is entitled to a section 31 credit "for income tax constructively withheld." He further argues that, as a result, "no penalties or additions to tax are applicable to * * * [him]." Petitioner bases his theory of constructive withholding on our report in *Whalen v. Commissioner*, T.C. Memo. 2009–37.

As to whether VarTec did, in fact, pay the taxes associated with the 1999 exercise, respondent argues:

Rather than evidencing payment of an employer income tax withholding liability attributable to petitioner's stock options exercise, * * * [the VarTec] proofs of claim and amended proofs of claim corroborate the Appeals Office settlement of the proposed adjustments to Excel's 1999-year employment tax liability, which settlement included a concession of the income tax withholding liability previously proposed by the Service's examination function. The settlement was for an additional employment tax liability in the amount of $70,506.00 for each calendar quarter of 1999, or $282,024.00 total, for the year. The executed agreement to assessment of additional employment tax reflects precisely this, as do the assessments shown on the Form 941 transcripts for Excel Management.

B. *Scope and Standard of Review*

The parties dispute the scope and standard of review applicable in this case.[2] However, we decline to resolve the scope and standard of review issues they raise because we find that no payment was made by Excel or a successor corporation, in 2004 or 2005, of the nonwithheld taxes related to the 1999 exercise. In addition, we find that there is insufficient evidence to establish that any such payment occurred, whether or not we apply the de novo standard adopted by this Court in *Robinette v. Commissioner*, 123 T.C. 85 (2004), *rev'd*, 439 F.3d 455 (8th Cir. 2006). Under these circumstances, we need not resolve the parties' dispute as to the scope and standard of review. *See Kohn v. Commissioner*, T.C. Memo. 2009–117, *aff'd*, 377 Fed. Appx. 578 (8th Cir. 2010).

_____

[2] The Form 4340 also shows subsequent credits for 1996, 1997, and 2006 overpayments totaling $364,761 and a 2006 payment of $123,788. The parties agree that the additions to tax issues are subject to a de novo scope and standard of review.

II. *Respondent's Right To Collect Petitioner's 1999 Unpaid Tax Liability*

A. *The Payment Issue*

1. *Burden of Proof*

Even though petitioner has argued for de novo review of the factual issue of whether a third party, in effect, paid his underlying 1999 tax liability (payment issue), he has not invoked section 7491(a) to argue that respondent bears the burden of proof with respect to that issue. We will assume, without deciding, that de novo review is proper and base our resolution of the payment issue upon a preponderance of all of the evidence in the record. Therefore, assignment of the burden of proof is unnecessary. *See, e.g.*, *Estate of Bongard v. Commissioner*, 124 T.C. 95, 111 (2005).

2. *Discussion*

As noted *supra*, petitioner's argument that VarTec paid the withholding taxes associated with the 1999 exercise is essentially premised on the fact that the $7,030,569 "WT–FICA" claim for 1999 against Excel Management Service that was included in the Commissioner's November 2004 proof of claim filed in the VarTec bankruptcy was reduced to a $282,024 claim in his August 2005 amended proof of claim filed in that bankruptcy. We agree, however, with respondent that the reduction in the proof of claim amount is more likely corroborative of a decision by the Commissioner to adopt the Appeals officer's settlement of the Excel audit as reflected on the Form 2504 (wherein the Commissioner sought only the Medicare taxes associated with all of the 1999 option exercises) than it is of VarTec's payment of the taxes that Excel should have withheld from petitioner in connection with the 1999 exercise.

We also dispute petitioner's characterization of the Appeals officer's statement in his recommended settlement of the Excel audit that the taxes proposed by the agent with respect to petitioner "will be left unchanged". As noted above, petitioner apparently reads into that statement an intent to continue to pursue Excel (and its successor corporations) for the taxes associated with the 1999 exercise. Whatever the Appeals officer's intent when he included that statement in

his recommendations for resolving the NQO exercise issue for 1998 and 1999, the Form 2504 executed by the parties and later reflected in the actual assessments against the Excel group reflect the Commissioner's decision *not* to pursue Excel (or any successor corporation) for failure to withhold income taxes on the 1999 exercise.

We find no merit in (1) petitioner's reliance on respondent's Form 4340 for petitioner and his former wife jointly, which shows a March 10, 2008, reversal of the existing $2,084,961 debit balance, as proof that "[p]etitioner has no outstanding tax liability for * * * 1999" and (2) his rejection, as improper, of respondent's transfer of that debit balance to petitioner, individually. As noted *supra*, respondent made that reversal and transfer incident to granting petitioner's former wife relief from the outstanding 1999 joint tax liability arising from the 1999 exercise. We agree with respondent that the reversal and transfer of the outstanding assessed balance from petitioner and his former wife jointly to petitioner individually was in accordance with IRS procedures, *see* Internal Revenue Manual pts. 3.17.243.13.2 (Jan. 1, 2008), 8.20.2.5 (Oct. 16, 2007), and did not indicate that petitioner has no outstanding liability for 1999.

The Forms 4340 for both petitioner's and the Excel group's 1999 taxable year reflect no assessment or payment of withholding taxes attributable to petitioner's income from the 1999 exercise. Petitioner cites a 2007 Treasury Inspector General for Tax Administration report, which, he states, "describes the IRS's difficulty in 'cross posting' tax payments to all affected 'payee' accounts". Notwithstanding the existence of that report, it is well established that a Form 4340 or a computer printout of a taxpayer's transcript of account, absent a showing of irregularity, provides sufficient verification of the taxpayer's outstanding liability to satisfy the requirements of section 6330(c)(1) (requirement that the Appeals officer conducting a collection due process (CDP) hearing obtain verification "that the requirements of any applicable law or administrative procedure had been met"). *See, e.g.*, *Davis v. Commissioner*, 115 T.C. 35, 40–41 (2000); *Roberts v. Commissioner*, T.C. Memo. 2004–100; *Tornichio v. Commissioner*, T.C. Memo. 2002–291. Petitioner has not demonstrated any irregularity in the preparation of the foregoing transcripts, and we see no reason to depart from that

principle in this case. *See Davis v. Commissioner*, 115 T.C. at 41; *Tornichio v. Commissioner*, T.C. Memo. 2002–291.

### 3. *Conclusion*

No third-party payment of the nonwithheld taxes was made related to the 1999 exercise.

### B. *Section 31 Credit Issue*

On the assumption that VarTec paid the nonwithheld taxes in 2004 or 2005, petitioner contends (and respondent disagrees) that he is entitled to a credit under section 31 and section 1.31–1(a), Income Tax Regs. The parties also dispute the effect of *Whalen v. Commissioner*, T.C. Memo. 2009–37, where, in dicta, we suggested that an employer's actual payment to the IRS of the tax that the employer should have withheld "could *plausibly* be characterized as withholding tax under chapter 24 with a corresponding section 31 credit being allowed to a proper recipient for an appropriate year." (Emphasis added.) *Whalen* was a deficiency case, not a collection case. Ms. Whalen contended that she was entitled to a credit against a deficiency for 2004 of taxes that should have been withheld in 2001 but were not paid until 2004. She lost that argument.

Petitioner is not entitled to a credit under section 31 because, as we have found above, no third-party payment was made. We may one day be presented with a case in which the IRS proposes to collect a party's liability that has been paid by another person. For now, however, the better course is "to observe the wise limitations on our function and to confine ourselves to deciding only what is necessary to the disposition of the immediate case." *Whitehouse v. Ill. Cent. R.R.*, 349 U.S. 366, 372–373 (1955); *accord Ashwander v. TVA*, 297 U.S. 288, 345–346 (1936) (Brandeis, J., concurring); *Liverpool, N.Y. & Phila. S.S. Co. v. Emigration Comm'rs*, 113 U.S. 33, 39 (1885). Our silence on the issue should not be construed as our agreement with either party's argument.

### C. *The Appeals Officer's Refusal To Consider Collection Alternatives*

In the cover letter to his Form 12153 requesting a CDP hearing, petitioner asked respondent to consider collection

alternatives, including an offer-in-compromise based upon doubt as to collectibility and an installment agreement. Moreover, he and Mr. Jeka addressed those matters during and after the CDP hearing. Petitioner failed, however, to submit the financial information that Mr. Jeka requested; nor did he submit an offer-in-compromise before the expiration of repeated deadlines that Mr. Jeka extended to him for doing both. As a result, petitioner and Mr. Jeka agreed to neither an offer-in-compromise nor an installment agreement.

In his petition, petitioner claims that Mr. Jeka's failure to provide collection alternatives was an abuse of discretion. He does not, however, raise the issue in his briefs. Therefore, we consider petitioner to have abandoned that claim. *E.g.*, *Money v. Commissioner*, 89 T.C. 46, 48 (1987); *see* Rule 151(e)(4) and (5) (requiring that a party's brief state the points and arguments on which he relies). Moreover, even if petitioner had raised the collection alternatives issue in his briefs, his failure to submit an offer-in-compromise or requested financial information to Mr. Jeka would cause us to sustain Mr. Jeka's determination not to offer collection alternatives. Under the circumstances, Mr. Jeka's action did not represent an abuse of discretion. *See Kendricks v. Commissioner*, 124 T.C. 69, 79 (2005); *Orum v. Commissioner*, 123 T.C. 1, 13 (2004), *aff'd*, 412 F.3d 819 (7th Cir. 2005).

D. *Conclusion*

Mr. Jeka properly sustained collection with respect to petitioner's 1999 unpaid tax liability.

III. *Petitioner's Entitlement to an Abatement of Assessed Interest*

A. *Introduction*

Petitioner asks for the abatement of interest both on account of Mr. Jeka's conduct and because the IRS did not timely credit his $1,600,000 payment.

B. *Application of Section 6404(e)(1)(B)*

Petitioner argues for the first time in his opening brief that assessed interest from June 13, 2007 (the date on which the

Appeals Office issued the notice of determination),[3] must be abated pursuant to section 6404(e)(1)(B) (abatement of interest attributable to an "erroneous or dilatory" performance of "a ministerial or managerial act" by an IRS officer or employee).

We conclude that petitioner is precluded from raising an issue under section 6404(e)(1)(B) because he did not raise it in his petition, at his hearing before Mr. Jeka, in his pretrial memorandum, or at trial. *See* Rule 331(b)(4); *Behling v. Commissioner*, 118 T.C. 572, 579 (2002); *Brecht v. Commissioner*, T.C. Memo. 2008–213. Further, the evidence does not support petitioner's allegations that Mr. Jeka was erroneous or dilatory in his actions or that Mr. Jeka "showed institutional bias at every turn". Therefore, petitioner is not entitled to an abatement of interest pursuant to section 6404(e)(1)(B).

C. *Whether Respondent Timely Credited Petitioner's Tax Payments for 1999*

1. *Discussion*

Petitioner argues that he paid $1,600,000 in discharge of his 1999 income tax liability on April 15, 2000, with the filing of his request for an extension of time to file the 1999 return. Respondent's Form 4340 for petitioner for 1999 reflects a $1,500,000 payment on July 17, 2001, and a $100,000 payment on October 22, 2001. Petitioner seeks an abatement of the interest on (1) $1,500,000, attributable to the period from April 15, 2000, to July 17, 2001, and (2) $100,000, attributable to the period from April 15, 2000, to October 22, 2001.

It is a longstanding position of this Court that a Form 4340 or a computer printout of a taxpayer's transcript of account, absent a showing of irregularity, provides sufficient verification of the taxpayer's outstanding liability to satisfy the requirement of section 6330(c)(1) that the Appeals officer conducting a CDP hearing obtain verification "that the requirements of any applicable law or administrative procedure had been met." *See, e.g.*, *Davis v. Commissioner*, 115 T.C. at 35–36; *Roberts v. Commissioner*, T.C. Memo. 2004–

---

[3] It is not clear why petitioner selected that date as the date from which no additional interest should run.

100; *Tornichio v. Commissioner*, T.C. Memo. 2002–291. In the light of petitioner's failure to demonstrate any irregularity in the preparation of the foregoing transcripts, we see no reason to depart from that principle in this case. *See Davis v. Commissioner*, 115 T.C. at 41; *Tornichio v. Commissioner*, T.C. Memo. 2002–291. Petitioner offers only the 1999 return as evidence of his April 15, 2000, payment of $1,600,000. That is insufficient to overcome the contrary evidence provided by the Form 4340 for 1999. A tax return signed under penalty of perjury does not establish the truth of the facts stated therein. *E.g.*, *Wilkinson v. Commissioner*, 71 T.C. 633, 639 (1979).

2. *Conclusion*

Petitioner is not entitled to any interest abatement based upon payment of $1,600,000 of his 1999 tax liability on April 15, 2000.

D. *Conclusion*

Petitioner is not entitled to any interest abatement for 1999.

IV. *The Additions to Tax*

A. *Section 6651(a)(2) Addition to Tax for Failure To Make Timely Payment of Tax Due*

1. *Introduction*

Respondent assessed $147,435 and $442,648, on December 18, 2000, and November 21, 2005, respectively, as additions to tax under section 6651(a)(2) for petitioner's failure to timely pay his 1999 income tax liability. Respondent bears the burden of production with respect to those additions. *See* sec. 7491(c). In order to carry that burden, respondent must produce sufficient evidence to establish that it is appropriate to impose the additions. *See Higbee v. Commissioner*, 116 T.C. 438, 446–447 (2001). Once respondent has done so, the burden of proof is on petitioner to show that the additions are improper. *See id.* at 447. As discussed *supra* in section III.C.1. of this report, the Form 4340 for petitioner's 1999 taxable year supports a finding that petitioner made no payments of income tax owed for 1999 until July 17 and October

22, 2001, and that those payments, totaling $1,600,000, were his only payments in discharge of his total, reported, 1999 income tax liability of $3,276,333. Therefore, respondent has satisfied his burden of production under section 7491(c).

Section 6651(a)(2) imposes an addition to tax of up to 25% of the tax shown on a return for failure to make timely payment thereof, unless it is shown that such failure is due to reasonable cause and not due to willful neglect. Petitioner argues that there was reasonable cause for his failure to timely pay his 1999 tax liability: (1) undue financial hardship, (2) his alcoholism, and (3) retroactive application of section 31(a) credits. We have already decided that petitioner is not entitled to any section 31(a) credits as an offset to his income tax underpayment for 1999. Therefore, we will consider only the first two grounds for petitioner's claim of reasonable cause.

### 2. *Undue Hardship*

Petitioner alleges undue hardship on the ground that he (1) "lacked the ability to ascertain the amount, or existence of his outstanding 1999 income tax liability, despite his good faith attempts to do so", and (2) "paid as much of the 1999 income tax liability as he could, attempting to satisfy his obligations, despite the fact that this payment placed him in a very difficult financial situation." Neither of those alleged circumstances supports petitioner's claim of reasonable cause for the late payment, in part, and nonpayment, in part, of his 1999 income tax liability.

Before the April 15, 2000, due date of his return, petitioner knew that he had received the option proceeds unreduced by any tax payments, either withheld by Excel or remitted by him. The plan required Excel to notify the optionee of the "amount due" on exercise, including "amounts necessary to satisfy applicable * * * tax withholding requirements." Excel's alleged failure to fulfill that requirement does not excuse petitioner's failure to pay all of the income tax that he knew was due with respect to his 1999 taxable income, which included the spread amount that petitioner reported as short-term capital gain. *See McWhorter v. Commissioner*, T.C. Memo. 2008–263 (employer's failure to withhold taxes that should have been withheld does not excuse an

employee's failure to file a return or pay taxes nor relieve him of the additions to tax under section 6651(a)). Nor does petitioner's "very difficult financial situation" constitute reasonable cause for his failure to timely pay his 1999 income tax liability. Petitioner argues that he feared the necessity of twice paying that liability, once to respondent and once, as reimbursement, to Excel. But, as discussed *supra*, by obtaining proof of payment from petitioner, Excel, pursuant to section 3402(d), either could have avoided liability for the same tax or, if it had in fact paid it, obtained a refund thereof. Moreover, petitioner's illiquidity as of April 15, 2000, was a problem of his own making. After his exercise of the 1999 NQOs, petitioner had the funds necessary to pay the taxes associated with his income from the 1999 exercise. The fact that he lost most of those funds by investing them in high technology stocks and ventures that ultimately failed (and did not retain sufficient funds to pay his 1999 tax) does not provide a basis for his claim of reasonable cause for his nonpayment or late payment of tax. See section 301.6651–1(c)(1), Proced. & Admin. Regs., which, in relevant part, provides as follows:

A failure to pay will be considered to be due to reasonable cause to the extent that the taxpayer has made a satisfactory showing that he exercised ordinary business care and prudence in providing for payment of his tax liability and was nevertheless either unable to pay the tax or would suffer an undue hardship * * * if he paid on the due date. * * * [A] taxpayer who invests funds in speculative or illiquid assets has not exercised ordinary business care and prudence in providing for the payment of his tax liability unless, at the time of the investment, the remainder of the taxpayer's assets and estimated income will be sufficient to pay his tax or it can be reasonably foreseen that the speculative or illiquid investment * * * can be utilized (by sale or as security for a loan) to realize sufficient funds to satisfy the tax liability. * * *

### 3. *Petitioner's Alcoholism*

In defense of his position that his alcoholism constituted reasonable cause for his failure to timely pay his 1999 tax liability, petitioner argues that he was essentially incapacitated by his drinking problem on the April 15, 2000, due date of the 1999 return. That argument is seriously undercut, however, by his argument of undue financial hardship. In connection with the latter argument, petitioner testified that, between the April 15, 2000, due date and the October 20,

2000, filing date of the 1999 joint return, he was well aware of his outstanding tax liability for 1999 and that he took a number of steps (attempting to borrow against and, then, to sell his two homes) to raise the funds necessary to discharge that liability. Those actions are hardly the actions of a man incapacitated by alcoholism.

Moreover, although petitioner testified that in 2000 he recognized that his drinking was "getting problematic", it was not until 2001 that he began drinking throughout the day and, sometimes, night. Even during the 2001–02 period, however, he was able to continue his consulting business, and upon his admittance to the Center on September 5, 2002, Center personnel noted that he was a "bright and alert male in no distress" and that his "affect", "orientation", and "memory" were all normal. [4]

Because petitioner was not incapacitated by alcoholism on the due date of the 1999 joint return or thereafter, that condition does not constitute reasonable cause for his failure to timely pay the income taxes shown on that return. *See, e.g.*, *Hazel v. Commissioner*, T.C. Memo. 2008–134; *Jones v. Commissioner*, T.C. Memo. 2006–176; *Harbour v. Commissioner*, T.C. Memo. 1991–532; *Gardner v. Commissioner*, T.C. Memo. 1982–542.

### 4. *Conclusion*

Petitioner has not shown that his failure to timely pay the tax liability shown on the 1999 return was due to reasonable cause and not due to willful neglect. Therefore, Mr. Jeka properly sustained collection with respect to the additions to tax under section 6651(a)(2). [5]

---

[4] Petitioner has neither alleged nor shown a causal relationship between his having operated in a highly stressful and volatile business environment throughout his employment by Excel and his failure to timely pay his 1999 tax liability.

[5] Because we have sustained, *supra*, respondent's crediting of petitioner's $1,500,000 payment in partial discharge of his 1999 income tax liability as of July 17, 2001, rather than as of April 15, 2000, as alleged by petitioner, we also reject petitioner's additional argument that his sec. 6651(a)(2) addition must be reduced to reflect the earlier payment.

B. *The Section 6654 Addition to Tax for Failure To Make Timely Estimated Tax Payments*

1. *Discussion*

Respondent assessed an addition to tax of $101,872 under section 6654 for petitioner's failure to timely pay estimated tax. Petitioner argues that imposition of the section 6654(a) addition to tax for underpayment (or, in this case, non-payment) of estimated tax for 1999 "would be against equity and good conscience" within the meaning of section 6654(e)(3)(A). [6]

Because (1) respondent's Form 4340 for petitioner for 1999 shows no payments of tax for 1999 until July 17 and October 22, 2001, and (2) petitioner showed a substantial tax liability on his prior year (1998) return (facts establishing that petitioner had a "required annual payment" for 1999 within the meaning of section 6654(d)(1)(B)), we find that respondent has satisfied his burden of production under section 7491(c). The burden of proof is on petitioner to show that he is covered by one of the relief provisions of section 6654, which, in this case, means section 6654(e)(3)(A) (section 6654 contains no provision relating to reasonable cause and lack of willful neglect).

Petitioner makes the same arguments (undue hardship, alcoholism) that he made in alleging reasonable cause under section 6651(a)(2). For the reasons given for rejecting those arguments as they related to respondent's additions to tax under that provision, we reject them as justification for reversing respondent's imposition of the addition to tax under section 6654(a). The evidence of undue hardship and alcoholism does not support a finding that imposition of the section 6654(a) addition to tax herein "would be against equity and good conscience" within the meaning of section 6654(e)(3)(A).

---

[6] Here, again, we reject petitioner's additional argument that respondent failed to take into account petitioner's alleged payment of $1,500,000 on April 15, 2000, the return due date. We reject that argument, not only for the reasons stated *supra* note 5 with respect to respondent's imposition of the addition to tax under sec. 6651(a)(2), but also because April 15, 2000, was not within any period during which an estimated tax payment for 1999 was due. Rather, it constituted the termination date for the running of interest from each of the four estimated payment dates for 1999. *See* sec. 6654(b)(2).

2. *Conclusion*

Mr. Jeka properly sustained collection with respect to the addition to tax under section 6654(a).

*Decision will be entered for respondent.*

Reviewed by the Court.

COHEN, FOLEY, VASQUEZ, GALE, THORNTON, MARVEL, GOEKE, WHERRY, KROUPA, GUSTAFSON, PARIS, and MORRISON, *JJ*., agree with this opinion of the Court.

————————

HALPERN, *J*., concurring: I concur with the results reached by the majority with respect to all of the issues. I write separately, however, to express my disagreement with the majority's failure to hold, in deciding the section 31 credit issue, that, even if VarTec, in a later year, paid the nonwithheld taxes associated with the 1999 exercise, petitioner, *as a matter of law*, would not be entitled to a section 31(a) credit for that payment.

I. *Introduction*

Petitioner's sole argument is that he is entitled to a section 31(a) credit against his 1999 tax liability for VarTec's 2004 or 2005 payment of nonwithheld taxes associated with the 1999 exercise. Respondent argues that (1) VarTec did not make the alleged payment, and (2) as a matter of law, any such payment would not entitle petitioner to a section 31(a) credit. The majority holds that petitioner's argument fails because a preponderance of the evidence does not support the existence of such a payment. I would also hold that petitioner's argument fails because, as respondent argues, any such payment would not, as a matter of law, entitle him to a section 31(a) credit. Moreover, I would make the latter holding the principal holding in the case. The majority would postpone addressing the legal issue until we are "presented with a case in which the IRS proposes to collect a party's liability that has been paid by another person." [1] *See* op. Ct.

————

[1] The above-quoted language implies that an employer's payment of nonwithheld taxes attributable to a prior year may constitute a payment of the employee's tax liability. As discussed *infra*, such a payment discharges the employer's, not the employee's, tax obligation. *See infra* sec. II.B. and C.

p. 242. It further cautions: "Our silence on the [legal] issue should not be construed as our agreement with either party's argument." *See id.* p. 242. The majority leaves open the possibility that, on the basis of our decision in *Whalen v. Commissioner*, T.C. Memo. 2009–37, employees will be encouraged to argue (as did petitioner) that an employee whose employer failed to withhold taxes during a particular taxable year is entitled to a section 31(a) credit for the employer's payment in a subsequent taxable year of the non-withheld taxes. [2]

The majority notes that "*Whalen* was a deficiency case, not a collection case", thus implying that the case is somehow distinguishable and, therefore, that the majority's postponement in deciding the legal issue would not encourage employees to advance an argument similar to that advanced by petitioner. I would submit that an employer's payment of a prior year's nonwithheld taxes either is or is not creditable by the employee under section 31(a), regardless of the context in which that issue arises.

For the reasons set forth below, I believe the law is clear that an employer's (or former employer's) payment to the Internal Revenue Service (IRS) of taxes that should have been, but were not, withheld in a prior year does not entitle the employee to a section 31(a) credit for that payment. Under those circumstances we have a duty not to mislead taxpayers by perpetuating a case, *Whalen*, that may very well encourage needless litigation. Therefore, we should hold, in the alternative, that, as a matter of law, the VarTec pay-

---

[2] The majority seems to not share this concern, describing as obiter dictum our suggestion in *Whalen v. Commissioner*, T.C. Memo. 2009–37, that an employer's subsequent-year payment to the Internal Revenue Service (IRS) of taxes that should have been withheld in a prior year "could plausibly be characterized as withholding" eligible for the sec. 31(a) credit. *See* op. Ct. p. 242. In *Whalen*, we went on to state, however, that the employer's delinquent payment in 2004 of the amount it failed to withhold in 2001 could not properly be credited to the taxpayer employee for 2004 because "the tax is considered withheld [by the employer] for * * * [the taxpayer's] 2001 income tax." "Therefore," we added, "[the taxpayer] is properly denied the use of the section 31 credit to determine an overpayment for 2004." In other words, in addition to the earlier statement that it was "plausible" to characterize the employer's 2004 payment as withholding for 2001, we denied the taxpayer a 2004 sec. 31 credit *because* we considered the payment as withheld for 2001. We went beyond (1) granting that one could plausibly argue for constructive withholding to (2) adopting constructive withholding for 2001 as the reason we denied the taxpayer a withholding credit for 2004. It is difficult to dismiss our reasoned analysis of why the taxpayer lost as merely "something said in passing"; i.e., "obiter dictum". Black's Law Dictionary 1177 (9th ed. 1999) ("Latin 'something said in passing' * * * 'Often shortened to *dictum*'"). Petitioner did not unreasonably attach more weight to it than that.

ment alleged by petitioner, even if proven, would not entitle him to a section 31(a) credit therefor.[3]

II. *Section 31 Credit Issue*

   A. *Background*

Section 3402(a) requires the withholding of income tax on wages. Section 3401(a) defines "wages" generally as "remuneration * * * for services performed by an employee for his employer". The medium in which the remuneration is paid is immaterial and may include stock. Sec. 31.3401(a)–1(a)(4), Employment Tax Regs. Moreover, remuneration for services constitutes wages even though paid after the recipient's employment relationship with the employer has ended. *Otte v. United States*, 419 U.S. 43, 49–50 (1974) ("a continuing employment relationship is not a prerequisite for a payment's qualification as 'wages.'"); sec. 31.3401(a)–1(a)(5), Employment Tax Regs. (to the same effect as *Otte* and relied on by the U.S. Supreme Court therein). The option proceeds constituted wages subject to withholding of income tax, even though petitioner received them after having left Excel's employ. Petitioner concedes that "neither Excel or Paine Webber withheld taxes on his behalf in 1999." Nevertheless, he argues that VarTec's alleged 2004 or 2005 payment of those nonwithheld taxes entitles him to a corresponding credit for 1999 under section 31(a) and section 1.31–1(a), Income Tax Regs. Petitioner is mistaken.

---

[3] The fact that this case can be disposed of on the basis of our finding no payment would not make a holding with respect to sec. 31(a) creditability dictum. The U.S. Supreme Court announced the pertinent principle over 100 years ago in *Union Pac. R.R. v. Mason City & Fort Dodge R.R.*, 199 U.S. 160, 166 (1905):

Whenever a question fairly arises in the course of a trial, and there is a distinct decision of that question, the ruling of the court in respect thereto can, in no just sense, be called mere dictum. *Railroad Companies v. Schutte*, 103 U.S. 118, in which this court said (p. 143):

"It cannot be said that a case is not authority on one point because, although that point was properly presented and decided in the regular course of the consideration of the cause, something else was found in the end which disposed of the whole matter. Here the precise question was properly presented, fully argued, and elaborately considered in the opinion. The decision on this question was as much a part of the judgment of the court as was that on any other of the several matters on which the case as a whole depended."

B. *Section 3403 Imposes an Independent Liability Upon Employers for Failure To Withhold Taxes.*

In its entirety, section 3403 provides: "The employer shall be liable for the payment of the tax required to be deducted and withheld under this chapter [chapter 24, sections 3401–3406], and shall not be liable to any person for the amount of any such payment."

Section 31.3403–1, Employment Tax Regs., which implements section 3403, emphasizes that employers "required to deduct and withhold * * * tax under section 3402" are liable, under section 3403, "for the payment of such tax whether or not it is collected from the employee by the employer." Thus, the employer's tax liability under section 3403 is independent of the employee's liability under sections 1 and 61(a)(1) to pay tax on the same wages. *See Whalen v. Commissioner*, T.C. Memo. 2009–37. The employer's section 3403 liability for nonwithheld taxes can be abated, however, if the employer shows that the employee paid the taxes in question. Sec. 3402(d). [4]

There is no equivalent general abatement or credit provision applicable to employees. [5] Thus, an employee's liability for income taxes is not subject to abatement or credit under section 31(a) merely because the employee proves that the employer paid the tax he had previously failed to withhold. *See* sec. 3403. [6] There is an exception, however, in the limited circumstances wherein the employer pays the employee's

---

[4] In pertinent part, sec. 3402(d) provides:

If the employer, in violation of the provisions of this chapter, fails to deduct and withhold the tax under this chapter, and thereafter the tax against which such tax may be credited is paid, the tax so required to be deducted and withheld shall not be collected from the employer * * *.

Sec. 3402(d) would appear to represent congressional anticipation of our concern in *Whalen v. Commissioner*, T.C. Memo. 2009–37, wherein we observed: "To conclude that withholding tax is a separate tax invites the possibility of an employee's income being taxed twice." There is, of course, only one tax, but there are two separate and independent collection mechanisms: from the employer pursuant to sec. 3402 or sec. 3403 and from the employee on the basis of, generally, secs. 1, 61(a)(1), 6151(a), and 6155.

[5] A limited exception to that observation, inapplicable herein, is provided by sec. 4999(c) with respect to an employer's excess golden parachute payments to an employee. The effect of that provision is to require the employer to treat its payment of the 20% excise tax applicable to such payments as additional income tax withholding. That treatment assures the employee of a sec. 31(a) credit for the employer's payment and, in effect, prohibits the Commissioner from looking to him for payment of that tax with respect to the same excess parachute payment.

[6] As a practical matter, sec. 3402(d) may discourage the Commissioner from pursuing the employee for taxes previously collected from the employer because that provision would permit the employer to recoup its payment to the extent it can show that the same tax amount was collected from the employee.

taxes that the employer did not timely withhold and the employee reimburses him under the correction and settlement procedures adopted by the regulations under section 6205 (discussed *infra* section II.C. of this concurring opinion). Absent satisfaction of that exception, employer payments of nonwithheld taxes under section 3403 do not constitute payments of taxes that have "actually been withheld at the source" as required by section 1.31–1(a), Income Tax Regs. Therefore, such payments are not creditable by the employee under section 31(a) (discussed *infra* section II.D. of this concurring opinion).

C. *Section 6205(a)(1) and the Regulations Governing Corrections of Prior Underwithholdings*

In relevant part, section 6205(a)(1) provides:

If less than the correct amount of tax imposed by section * * * 3402 is paid with respect to any payment of wages or compensation, proper adjustments, with respect to both the tax and the amount to be deducted, shall be made, without interest, in such manner and at such times as the Secretary may by regulations prescribe.

The fact that an employer may make "proper adjustments, with respect to both the tax and the amount to be deducted [from employee wages]" on an interest-free basis incentivizes employers to make voluntary corrections of employment tax returns reflecting underwithholdings.

The regulations under section 6205(a)(1) permit an employer to correct an underwithholding of income tax (on an interest-free basis) on a supplemental return filed as late as "the last day on which the return is required to be filed for the return period in which the error was acertained." Sec. 31.6205–1(c)(2)(i), Employment Tax Regs.[7] Moreover, audit adjustments resulting from employment tax audits alleging income tax underwithholding may be paid, interest free, by the employer after the conclusion of the audit and appeals process, provided the payment is accompanied by a signed Form 2504, Agreement to Assessment and Collection of Addi-

---

[7] Except as otherwise noted, the sec. 6205 regulations cited throughout this concurring opinion were in effect in 1999 and during the period of the Excel audit and appeal and the Teleglobe and VarTec bankruptcies. The regulations are superseded by regulations finalized on July 1, 2008, T.D. 9405, 2008–32 I.R.B. 293, which apply to "any error acertained on or after January 1, 2009", *id.* The 2008 regulations do not change, in any material respect, the prior regulations cited herein.

tional Tax and Acceptance of Overassessment, and is made before the employer receives a notice and demand for payment. Sec. 31.6205–1(a)(6)(i), Employment Tax Regs. (as amended in 2001); Rev. Rul. 2009–39, Situation 9, 2009–52 I.R.B. 951, 956 (obsoleting Rev. Rul. 75–464, Situation 2, 1975–2 C.B. 474, 475, to the same effect).

When the employer corrects an underwithholding of income tax and pays amounts pursuant to section 3403, the section 6205 regulations restrict the situations in which the employer is entitled to employee reimbursements. In general, an employer is permitted to collect income tax withholding shortfalls from its employees if it collects the underwithheld amount within the same calendar year as the underwithholding "by deducting such amount from remuneration of the employee, if any, under * * * [the employer's] control [whether or not the remuneration constitutes wages]." Sec. 31.6205–1(c)(4), Employment Tax Regs. Undercollections in a calendar year not so corrected are "a matter for settlement between the employee and the employer within such calendar year." *Id.* I interpret that last provision to cover situations in which the employer is unable to deduct the requisite amount from employee remuneration before yearend; e.g., because the employee is entitled to too little or to no additional remuneration from the employer before then. It is not clear whether "settlement" before yearend means actual payment before yearend by the employee or execution before yearend of a binding obligation to pay after yearend; e.g., where the employee has insufficient funds to pay by yearend. Moreover, it is not clear whether such a binding obligation must be in the form of a debt instrument either bearing arm's-length interest, or, if no (or too little) interest is provided for, governed by the interest imputation rules of section 7872. There is no need to opine on those issues because none of the circumstances described in section 31.6205–1(c)(4), Employment Tax Regs., is present in this case. [8]

---

[8] It is only during the limited period in which an employer may seek reimbursement from an employee for the amount of the former's underwithholding corrections that a failure to do so will result in debt forgiveness income to the employee under sec. 61(a)(12). Employer underwithholding corrections after the expiration of that period, because they do not give rise to a right of reimbursement from the employee, do not discharge any debt that could result in debt forgiveness income to the employee. Moreover, because all underwithholding corrections by an employer pursuant to sec. 3403 discharge the employer's, rather than the employee's, tax obligation, *Old Colony Trust v. Commissioner*, 279 U.S. 716 (1929) (payment by an employer of an

Continued

D. *Application of the Section 31(a) Credit*

Section 31(a)(1) provides to every employee a credit against the employee's income tax obligation with respect to his or her wages for "[t]he amount withheld as tax under chapter 24 [sections 3401–3406]". Section 1.31–1(a), Income Tax Regs., limits the credit to "[t]he tax deducted and withheld at the source upon wages under chapter 24 of the Internal Revenue Code". That regulation further provides: "If the tax has actually been withheld at the source, credit or refund shall be made to the recipient of the income even though such tax has not been paid over to the Government by the employer."

It is clear from that language that an employee's right to a section 31(a) credit for employer income tax withholding is dependent on a finding that the tax has "actually been withheld" by the employer. The requisite actual withholding would occur only if the employer (1) withholds the required amounts from its wage payments to the employee pursuant to section 3402 or (2) corrects its failure to withhold the required amount, pursuant to section 6205 and the regulations thereunder, and recoups (or "settles") from the employee its payment of the underwithholding during the calendar year in which the underwithholding occurred as permitted by section 31.6205–1(c)(4), Employment Tax Regs. Only under those circumstances, not present herein, is it reasonable to conclude that there has been actual withholding by the employer (i.e., "at the source"). Therefore, any assumed 2004 or 2005 payment of taxes that should have been withheld from the proceeds of petitioner's 1999 option exercises does not constitute an "amount withheld as tax under chapter 24" under section 31(a); likewise, it does not constitute "tax deducted and withheld at the source" as required by section 1.31–1(a), Income Tax Regs.[9]

Permitting an employee to automatically claim a section 31(a) credit for *any* employer payment of tax pursuant to sec-

employee's income tax obligation in consideration of the employee's services performed on behalf of the employer constitutes income to the employee), is inapplicable thereto.

[9] I recognize that conclusion is inconsistent with our observation in *Whalen v. Commissioner*, T.C. Memo. 2009–37, that such a payment "could plausibly be characterized as withholding tax under chapter 24 with a corresponding section 31 credit being allowed to a proper recipient for an appropriate year." But it is the argument of this section II.D. that the payment in *Whalen* could not have been creditable under sec. 31(a) for any year.

tion 3403 would benefit equally employees who paid taxes on their wage income (whether or not withheld and reported on a Form W–2, Wage and Tax Statement) and employees, such as petitioner, who never paid taxes on that income, thereby unjustly enriching the latter. Moreover, such a result would open the door to unwarranted tax planning arrangements designed to frustrate the Commissioner's right to collect interest and additions to tax or penalties on late payments or underpayments of tax pursuant to sections 6601, 6651(a)(2), and 6654. For example, employees who have purposely underpaid their taxes on wage income and had their returns audited and been assessed significant deficiencies and interest (not unlike petitioner) would have the procedural ability to persuade their employers (or former employers) to voluntarily and retroactively pay those payroll taxes under the interest-free adjustment procedures of section 31.6205–1(c), Employment Tax Regs., by agreeing to reimburse the employer (or former employer) in full, thus enabling the employees to use the section 31(a) credit to effectively erase their liability for interest and, perhaps, additions to tax and penalties with respect to the deficiencies.[10] Where the employer has made a payment under section 3403 in a year after the year of underwithholding, the Commissioner should be permitted to collect the appropriate interest and additions to tax from the employee even though the Commissioner may be required to refund the tax amount to the employer pursuant to section 3402(d).

Petitioner's arguments to the contrary are not persuasive. His basic argument, that so-called constructive withholding satisfies the requirements of section 31(a) and that, under *Whalen v. Commissioner*, T.C. Memo. 2009–37, VarTec's 2004 or 2005 payment of nonwithheld taxes in bankruptcy constituted a constructive withholding of those taxes flies in the face of the specific requirement in section 1.31–1(a), Income Tax Regs., that availability of the credit be limited to tax that "has actually been withheld at the source". It is also inconsistent with the U.S. Supreme Court's description of

---

[10] By treating VarTec's assumed 2004 or 2005 payment in partial discharge of the Commissioner's proof of claim in the VarTec bankruptcy as withholding tax associated with petitioner's 1999 exercise (i.e., as "tax actually * * * withheld at the source"), that payment would necessarily be deemed to have been made on the original due date of the 1999 return, April 15, 2000. *See* sec. 6513(b)(1); *Baral v. United States*, 528 U.S. 431, 435–437 (2000).

withholding in *Begier v. IRS*, 496 U.S. 53 (1990), which petitioner cites as supportive of his position. In *Begier*, a case in which a trustee in bankruptcy unsuccessfully disputed the defendant's right to retain the debtor's prepetition payments to it of withheld taxes, the Court stated, in pertinent part:

Section 3402(a)(1) requires that "every employer making payment of wages shall deduct and withhold *upon such wages* [the employee's federal income tax]." (Emphasis added.) Withholding thus occurs at the time of payment to the employee of his net wages. * * * The common meaning of "withholding" supports our interpretation. See Webster's Third New International Dictionary 2627 (1981) (defining "withholding" to mean "the act or procedure of deducting a tax payment from income *at the source*") (emphasis added). [*Id.* at 60–61.]

### III. *Conclusion*

Assuming that Excel or VarTec paid all or a portion of petitioner's outstanding, self-assessed liability with respect to his income from the 1999 exercise, he would not be entitled to a credit under section 31(a)(1) for that payment, and we should say so.[11]

HOLMES, *J.*, agrees with this concurring opinion.

---

[11] And finally, borrowing from Judge Holmes' baseball analogy in *Stromme v. Commissioner*, 138 T.C. 213, 227 (2012) (Holmes, J., concurring), if an umpire calls a pitch a ball, and if the catcher complains that the pitch was in fact over the plate, it would not be improper for the umpire to point out to the catcher that, even if the pitch crossed the corner of the plate, it was below the batter's knees and, still, a ball.